[No. A094701. First Dist., Div. Three. Oct. 27, 2003.]

THE PEOPLE, Plaintiff and Respondent, v.
LEE SNYDER, Defendant and Appellant.

1204

## COUNSEL

Mark Greenberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson and , Ronald A. Bass, Assistant Attorneys General, Lawrence K. Sullivan and Aileen Bunney, Deputy Attorneys General for Plaintiff and Respondent.

OPINION

McGUINESS, P. J.—Following a jury trial, appellant Lee Snyder was convicted of murder, first-degree residential robbery, first-degree residential burglary, and automobile theft. The jury also found true a special circumstance allegation of felony murder committed during a robbery and burglary. The court sentenced appellant to life in prison without the possibility of parole plus six years. On appeal, he now contends we must reverse his conviction because (1) the trial court failed to submit to the jury the question of the potential accomplice liability of a key prosecution witness, or instruct pursuant to CALJIC No. 3.13 that the testimony of one accomplice cannot be used to corroborate the testimony of another accomplice; (2) to the extent the above argument may be barred by trial counsel's failure to request the instructions on the prosecution witness's potential accomplice liability, appellant received ineffective assistance of counsel; and (3) by instructing the jury pursuant to CALJIC No. 2.15 on the "slight" corroborating evidence necessary to permit an inference of guilt of robbery or burglary from evidence appellant was in conscious possession of recently stolen property, the trial court unconstitutionally lightened the prosecution's burden of proof as to both the felony murder charge and the special circumstances allegation. We disagree with appellant's contentions, and affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

This case concerns a home invasion burglary and robbery in Lafayette which resulted in the murder of Janet Daher (the victim) on March 24, 1998. At approximately 2:00 p.m. on that date, the victim's husband, Joseph Daher, drove away from the family's home on Rose Lane to attend their older daughter's high school softball game, forgetting to close the garage door as he did so. The garage provided direct access to the house, via the laundry room and the kitchen. The victim, whose Mercedes SUV was parked inside the garage, remained at home in the kitchen.

Annie Daher, the younger daughter of Joseph and the victim, was attending a local intermediate school at the time. The victim routinely picked Annie up after school at 3:00 p.m. at a parking lot near the school. After waiting about an hour for her mother on the afternoon of March 24, 1998, Annie walked home. When she arrived there between 4:30 and 4:45 p.m., she found the garage door open and her mother's SUV missing. The television was on in the living room, and the victim's purse was on the floor. The buckles on the purse had been ripped and the contents strewn all over the floor. After receiving a telephone answering machine message from the police reporting that her mother's vehicle had been found in Fairfield, Annie called the police.

Sergeant Michael Fisher of the Contra Costa County Sheriff's Department responded to the victim's home on Rose Lane in Lafayette based on two

dispatches reporting that the victim's Mercedes SUV had been found parked behind a roofing business in Fairfield with the keys in the ignition and the door open, and that the victim's 12-year-old daughter had found her mother's purse in the living room with the contents on the floor. When Sergeant Fisher arrived at the Daher residence at approximately 6:52 p.m., he found the garage door open. The victim's purse and its contents were strewn on the living room floor; the strap of the purse was torn in half, and the top of the purse appeared broken. When he checked the second floor, Sergeant Fisher found that the upstairs bedrooms and bathroom had all been ransacked. Cabinets were open, drawers were pulled out, and clothes were strewn about. In the master bedroom, Sergeant Fisher found the victim's body face down on the floor with a pool of blood around her head, her hands tied tightly behind her back, a telephone cord stretched from her hands to her neck, and slits in the back of her shirt from apparent stabbing. Sergeant Fisher secured the residence, alerted the Sheriff's Department that a homicide had been committed, and called for crisis intervention to assist the Daher family. He also notified the Fairfield Police Department to treat the victim's vehicle as a crime scene.

At trial, three witnesses testified to observing a group of three young men in the vicinity of the victim's Lafayette neighborhood around 2:30 p.m. on March 24, 1998. Nathan Bunting was flagging traffic on Happy Valley Road and supervising a crew working on telephone lines when his attention was attracted by the approach of three "punky-looking guys." Based on their "attitudes" and "[t]he way they were walking," they "[j]ust kind of looked like gangsters" who "didn't fit into the neighborhood" and "were up to, basically, no good." The three males were of different heights, one taller, one more medium, and the third shorter. One of the three was "white," while the other two appeared "Hispanic" or darker skinned. The white male, who was heavier-built than the other two, had a tattoo on his neck and manifested an assertive or aggressive attitude toward Bunting. From a photographic lineup which he was shown in June 1998, Bunting identified the man with the tattoo as Joseph Perez. Bunting could not positively identify appellant as one of the three males, although he testified that appellant had the complexion, the hair and the height and build of one of the two darker-complected men.

Kathleen Burke, a resident of Lafayette, was a friend of the victim. At 2:25 p.m. on March 24, 1998, she was driving on Rose Lane when she observed three young men walking on the street. Because of their appearance and the time of day, she thought they were probably not from the local high school. The three were of differing heights, and two had relatively darker complexions than the third. They were wearing heavy coats, which Burke considered inappropriate for the warm weather and the neighborhood. One had a ski or "stocking" hat on, while the other two were wearing baseball hats turned backwards. Something about their appearance made Burke feel "really

alarmed." She made a U-turn with her car and drove "very slowly" past the three, looking at them directly and obviously, "sort of to put them on warning that, you know, someone's seen you, and if you're on your way to do something, you probably shouldn't do it because you've been noticed." The three "were acting very nervous and kept looking back" at her as they walked in the direction of the Daher residence. Burke drove to a friend's house, telephoned 911, and told police "they should send somebody to the neighborhood" to check on the three young men she had seen, who appeared "very out of place." Burke then drove back down Rose Lane and waited, but left after about ten minutes when the police did not arrive. Burke testified that appellant had a similar size, build and facial features to one of the two shorter males in the group, but she could not identify him "for sure."

Roger Parkinson got off work as head custodian at an elementary school in Lafayette at approximately 2:15 p.m. on March 24, 1998. As he drove down Happy Valley road toward the BART station shortly thereafter, he observed "[t]hree guys" walking up the road in the opposite direction. They appeared "[j]ust out of place," in part because generally no one walked along that street, which had heavy traffic at that time of day. The one in the center was a "white guy with a moustache" and a "stocky" build; Parkinson noticed a tattoo "[l]ike a lightning bolt" on the left side of his neck. Another was shorter, of "medium" build, and possibly Hispanic in appearance. The third was taller and more slender. Based on his hair color and complexion, he also could have been Hispanic. The individual with the tattoo appeared unshaven, and had lighter hair than the other two. The three were wearing "puffy jackets" like parkas. Parkinson testified that appellant appeared "[m]aybe" to be of the same height, age, hair color and complexion as one of the two darker-skinned males.

Richard Solbrack was employed by a roofing company located on Cordelia Road in Cordelia. When he returned to the company yard some time after 5 p.m. on March 24, 1998, he observed a Mercedes SUV parked against a fence in the roofing yard. Fearing that the vehicle would be trashed or stolen if left in the yard, Solbrack notified his employer and flagged down Fairfield Police Officer Martin Kauffman. Officer Kauffman examined the green Mercedes SUV, and found the driver's side door unlocked and the key in the ignition. After a check of the license number revealed the vehicle had not yet been reported stolen, Officer Kauffman ·asked the dispatcher to attempt to make contact with the registered owner. Thereafter, the dispatcher advised Officer Kauffman that there was a "strong possibility" that the vehicle was an unreported stolen vehicle, and that a homicide could be involved. Officer Kauffman treated the vehicle as a crime scene. When Solbrack left the roofing yard at approximately 10 p.m., he observed three male youths

walking toward the roofing yard. They were of three distinctly different sizes, from taller to shorter. Solbrack testified that appellant "looks like one" of the three men he saw.

Both Justin Mabra and his girlfriend Megan McPhee had been friends with appellant and appellant's friend Maury O'Brien for years. Sometime in the evening after 8 p.m. in late March 1998, Mabra and McPhee returned to the home of Mabra's parents, with whom the couple was living. McPhee was driving her car; Mabra was in the passenger seat. As they arrived, they observed appellant, O'Brien, and a third male, whom neither Mabra nor McPhee had ever seen before, approaching Mabra's parents' house. Appellant and O'Brien did not introduce their companion to Mabra and McPhee. Mabra and McPhee talked with appellant and his companions for about 10 or 15 minutes to half an hour, with Mabra and McPhee in the passenger and driver's seat of McPhee's car, and the other three in the back seat. Appellant offered Mabra and McPhee some cocaine powder, and all five snorted it while sitting in the car. The three men asked Mabra and McPhee for a ride back to San Francisco or to a nearby car which they would use to drive themselves. McPhee refused to give them a ride. Eventually, the three youths secured a ride, and left with someone driving a white Cutlass. Appellant was wearing a black and green parka that could have been a Green Bay Packers jacket, and dark or black Nike shoes. McPhee noticed that the third man was wearing a large diamond earring. Mabra and McPhee later identified Joseph Perez as the third man from a live lineup.

Andrea Torres was a former girlfriend of appellant. She had terminated her relationship with appellant in August 1997, but they remained on good terms. Appellant lived with his father at a house in San Francisco rented from Torres's family. Torres saw appellant several times over a period of approximately 10 days in March 1998. She testified that during this time period, appellant was "always" with O'Brien. Torres also knew Perez, who had the street name "Rock" because he smoked crack cocaine. On March 27, 1998, appellant and O'Brien came to Torres's residence between noon and 1 p.m., unannounced. Torres spent most of the rest of the afternoon and evening "partying" with appellant and other friends and relatives. At one point, while Torres was sitting on appellant's lap, she noticed that he had a gun. Appellant showed Torres an "extraordinary," "very large ring" with a diamond in the shape of a triangle. Appellant kept trying to put the ring on Torres's ring finger. When she asked appellant where the ring came from, he replied "[d]on't worry about it." Torres testified that the ring looked "exactly" like one of the victim's rings. Appellant also showed Torres several gold chains, including one thick chain, and told her "I have more things like this." Appellant was wearing a puffy black "[s]tarter" coat with the Packers' name on it.

The crime scene was processed by criminalist Richard Schorr of the Contra Costa County Sheriff's Department. Schorr found no signs of forced entry. He recovered eight partial shoeprints in the garage area and four additional shoeprints from the laundry room floor. Two of the recovered shoeprints matched the right heel of appellant's size-12 black Nike Air athletic shoes. The pattern on the sole did not appear to be a common one. The contents of the victim's purse were on the family room floor, and cabinet doors had been left open. Drawers were open and jewelry boxes tipped over in the bedrooms of the victim's daughters. In the master bedroom, the contents of the drawers and entertainment center were strewn around the room. A ceiling-mounted speaker was on the floor, with sheetrock dust lying around it from where it had been pulled out of the ceiling. The other speaker had also been removed from its ceiling mount and left on the floor near the victim. Opened jewelry and storage boxes were tossed on the floor.

The victim's body was lying face down on the master bedroom floor. Her hands were tightly bound behind her back with telephone cord, which was also draped around her neck. The coiled cord had been forcibly stretched. Cord was missing from the telephone on the bedroom nightstand. There were slice or stab marks in the victim's back, and the blood had soaked into her blue sweatshirt. A "clump or tuft" of what appeared to be the victim's hair lay on the floor next to her, and blood was spattered on the wall near the victim's body. There were also bloody leather glove prints and blood stains in the shape of a knife on a comforter at the foot of the bed. Appellant's fingerprints were not found at the victim's residence.

Susan Hogan, a forensic pathologist, performed the autopsy on the victim. Hogan testified that the telephone cord ran around the victim's neck, "embedded" in the soft neck tissue, and then across and over the left shoulder, diagonally across the back from the left shoulder to the right hip, and around the wrists three times. The victim's tongue was protruding from her mouth, giving evidence of ligature strangulation cutting off the air and blood supply to the victim's head. Based on the evidence of hemorrhaging, Hogan opined that "tremendous force" had been applied to the victim's neck. This strangulation had been sufficient to be the cause of the victim's death. In addition, there were multiple cutting and deep stab wounds in the victim's neck, chest and back, at least four of which would have been fatal by themselves. Hogan testified that the stab wounds had been delivered with great force.

John Nelson, a criminalist for the Contra Costa County Sheriff's Department, processed the victim's Mercedes SUV for evidence. The driver's seat, steering wheel, rear console, center of the rear seat, window buttons, gear shift, automatic garage door opener, and an Altoids box found on the back seat all tested positive for blood. Cocaine salts were also found in sweepings from the vehicle.

On March 27, 1998, San Francisco Police Officer Moses Gala contacted appellant at appellant's residence. Appellant had a loaded handgun in his waistband. On June 7, 1998, Contra Costa County Sheriff's Department detective Edward Griffith assisted in the search of appellant's residence in San Francisco. During the search, police recovered a plastic bag containing jewelry, a pair of black Nike shoes, and a Green Bay Packers black warm-up jacket.

Jason Hart, testifying under a grant of immunity, stated that he was a neighbor and friend of Perez. Hart testified that Perez's nickname was "Rockhead." Hart met appellant a few months prior to March 1998 through Torres, a family friend. Thereafter, Hart sold appellant cocaine. He did not meet O'Brien until March 23, 1998. On that date, in response to appellant's call, Hart drove to appellant's home with Perez to sell appellant some cocaine. When they arrived at appellant's residence, O'Brien was there with appellant. Hart sold appellant approximately a gram of cocaine for $50. While Hart was there, appellant, Perez and O'Brien discussed going to Fairfield to get drugs by robbing a drug dealer O'Brien was acquainted with there. Perez asked Hart to give them a ride to Fairfield. Hart declined because "I didn't want to be a part of it." Nevertheless, Hart did not try to discourage them, because he hoped to buy stolen drugs from the three and then sell them himself at a profit.

The next day, March 24, 1998, appellant called Hart in the morning and asked to buy another $50 of cocaine. Hart and Perez drove to appellant's house around noon, where Hart sold appellant the cocaine. Appellant, Perez and O'Brien—who was also at appellant's residence—again tried unsuccessfully to get Hart to drive them to Fairfield so they could rob the drug dealer there. After driving around the neighborhood for about half an hour looking for someone to drive appellant, Perez, and O'Brien to Fairfield, Hart returned to appellant's house. At that point, the three were talking about taking BART to the Fairfield vicinity. Hart drove Perez, O'Brien and appellant to the Balboa Park BART station and dropped them off there. No arrangements were made at that time for Hart to pick the three up later. The rest of the day, Hart drove around with his friend DeShawn Dawson smoking marijuana.

Around 7:00 p.m. that evening, Hart received a telephone call from Perez asking Hart to pick the three up at the Overnighter Motel in Cordelia. Hart drove there with Dawson, arriving some time between 8:00 and 9:00 p.m. As soon as Hart pulled into the motel parking lot in his four-door white Blazer, appellant, Perez and O'Brien approached, having seen Hart's vehicle arrive. The three got in the backseat, while Dawson remained in the front passenger seat. On the way back to San Francisco, the three discussed a robbery. Perez said they had gotten off the BART train at Lafayette, walked a few blocks, found an open garage, and "proceeded into the house to see what they could

get." Perez told Hart there was "a lady" in the house, whom they asked for money. Because "she didn't have no money, . . . they strangled her with a phone cord." In describing the murder, Perez said "[w]e did it," not "I did it." Although Perez did all the talking, neither appellant nor O'Brien disputed his story or denied their involvement. Hart believed Perez's story that the three men had killed a woman in Lafayette. Dawson was upset that he and Hart had picked the three up, yelled that they were "idiots" and "stupid," and asked Hart to drop them off right away.

Appellant, O'Brien and Perez passed some jewelry around, and showed Hart some "nice rings," including "a gold band with a big diamond on top." The three had divided up the jewelry, with appellant getting the ring with the large diamond. After Hart returned the three to appellant's house in San Francisco, he tried to bargain with them to purchase some of the stolen jewelry. He was most interested in appellant's ring, which Hart thought was the best piece of jewelry because it had the largest diamond. Appellant wanted $1,000, which Hart did not have. Appellant refused to sell the ring for any lower price. Hart gave Perez $200 for a different diamond ring. Perez gave Hart a second ring, which Hart assumed was "for the ride home." Hart ultimately sold the first ring to a friend for $500, and sold the second ring to another friend. Appellant and O'Brien went to Hart's home the next day. Appellant wanted to sell the large ring to Hart, but Hart did not have enough money to meet appellant's price. They left after 20 minutes. The police interviewed Hart on June 9, 1998. Afterwards, Hart bought back the two rings he had gotten from Perez, and gave them to his lawyer, who in turn gave them to the police.

Dawson testified that he rode with Hart to the Fairfield area to pick up appellant, Perez and O'Brien. The three were "bragging" about "stealing or robbing or whatever." Dawson told them "that wasn't cool," and they were "stupid," "ignorant" and "dumb" to do it. Dawson could not remember if the three had also talked about "hurting anybody." Dawson was smoking marijuana "blunts" at the time. Dawson was unable to identify any of the three men he and Hart picked up in Fairfield that night.

O'Brien was called as a prosecution witness, with the understanding that his testimony would be taken into account in deciding whether or not the death penalty would be imposed in his case. In March 1998, when O'Brien was 18 years of age, he and appellant were living together at the home of appellant's father in San Francisco. Appellant was O'Brien's "closest friend." O'Brien and appellant used a lot of drugs together, primarily cocaine purchased from Hart. O'Brien met Perez in March 1998 when the latter came to appellant's house with Hart for a drug deal. Neither appellant nor O'Brien was working at the time; O'Brien paid for his drug use by "robbing and stealing and manipulating people." O'Brien conceived of the idea of robbing a "small time drug dealer" he had known in Fairfield, and who had a lot of

cash and drugs. O'Brien discussed the "plot" with appellant, who in turn told Perez. When they told Hart the plan and asked him to drive them to Fairfield, Hart refused to take part. According to O'Brien, "Jason Hart was against any of that. He didn't want to be involved in that." However, Hart "was interested in buying whatever drugs" they stole, or in selling them drugs if they were able to obtain cash from the robbery.

When Hart and Perez came back to appellant's residence on March 24, 1998, O'Brien again tried to talk Hart into giving them a ride to Fairfield. Because Hart "was a hundred percent against being any part of the robbery," O'Brien and appellant decided as "kind of a spur of the moment thing: Let's get on BART and go to Fairfield." O'Brien's plan was to get off in Pleasant Hill or Walnut Creek, steal a car, and then drive to Fairfield from there. Hart drove O'Brien, appellant and Perez to the Balboa Park BART station. "[B]ecause we all were dressed like dogs, thugs, or whatever," and looked like "misfits on the BART station with all the people there," the three initially sat apart from each other on the train to avoid attracting attention to themselves.

As they approached the "nice" area around Lafayette on the BART train, Perez pointed out "all the big houses" on the hillsides. Perez and appellant decided they wanted to get off at Lafayette and rob one of the houses there. O'Brien "wanted to stick to the original plan," but was persuaded by the others, "[b]ecause I have robbed houses in the past and I know that it's very profitable." The three men got off the train at the Lafayette station. After O'Brien and appellant used some cocaine in the restroom, they exited BART by jumping the turnstiles, and began walking toward the hills on the main road. O'Brien was wearing a black leather jacket, black pants, a black T-shirt and a black knit cap. Appellant was wearing black pants and a black and "real deep dark green" Green Bay Packers jacket with a hood. It was a hot day.

The three men passed a number of people as they walked toward the residential area of Lafayette, including a telephone repair crew and a woman in a white car "that kept circling us and was looking at us really good." The woman drove by them two or three times, and then stopped in the middle of the road to look at them. This made O'Brien nervous. When a police officer drove by, the three turned off the main road and into the residential streets. O'Brien saw a house with an open garage door, and suggested to the others that they go in. He assumed someone was at home, because the garage door was open and there was a green Mercedes SUV in the garage, with the keys in the vehicle. All three put on gloves, and O'Brien put a bandana over his

face. O'Brien was carrying a "very large knife and two smaller knives." Because appellant "was real nervous" and afraid he would shoot people if they got into a confrontation, he gave O'Brien his loaded gun.

The three entered the house, passing through the laundry room to the kitchen. O'Brien went first with the gun drawn, followed by the others. There was a woman in the kitchen. O'Brien "started yelling and screaming" that "this was a robbery," the gun was loaded, and she should keep her head down and not look at their faces "so that she wouldn't be killed right there." The woman turned, looked at them, and said "Oh my God." Joseph Perez then "socked her in the head" "pretty hard," causing her to fall to the floor. The woman started crying. O'Brien testified that "[s]he was very cooperative and quiet and just wanted us to leave." He walked around the kitchen pointing the gun at the woman, asking her if anybody else was at home, whether anyone was expected to be coming home, and "where everything was." The woman said her daughters were going to be coming home shortly. While he questioned her, appellant and Perez searched the rest of the house.

Based on what the woman said, O'Brien was concerned they did not have much time. Perez came back to the kitchen, "really upset" and "frustrated," because he could not find a safe or any valuables of any kind. Appellant appeared to be more successful, since "he had a bag that he was filling up with stuff." At some point, O'Brien yelled out appellant's name, saying "Lee, we got to hurry up." Both appellant and Perez were angry that O'Brien had said appellant's name out loud; Perez told O'Brien that he (O'Brien) would now have to kill the woman. O'Brien told appellant and Perez to take the woman upstairs and have her show them where the jewelry and valuables were. O'Brien stayed downstairs looking through the rooms, keeping watch through the windows, and acting as lookout. When he heard "a lot of noise" upstairs, he went to the top of the stairs to see what was going on. The door to the master bedroom was open, and O'Brien could see appellant pulling a cord from the wall. The victim was on the ground, face down. Appellant then "tore apart" the entertainment center in the bedroom, threw a speaker he thought was a video camera across the room, and ripped up videotapes in the apparent belief they were security tapes of himself and Perez. O'Brien searched other rooms for valuables, but found nothing worth stealing.

When he returned to the bedroom, O'Brien saw Perez and appellant "on top" of the victim, with the phone cord tied around her feet and neck, pulling her head backwards "real hard to strangle her or break her neck." The victim made no sound; O'Brien assumed she was unconscious. Perez then told O'Brien to hand him a knife to "finish the job." O'Brien handed Perez a hunting knife, and Perez stabbed the victim repeatedly while O'Brien and appellant watched. At that point, there was no doubt the victim was dead.

The three men carried the stolen items out to the garage in a bag. Among other things, there was jewelry and a Nintendo system. With Perez in the driver's seat, the three drove the victim's Mercedes SUV to Fairfield, still with the intention of pursuing the robbery of the drug dealer there. O'Brien returned the gun to appellant during the ride; appellant put the gun in his pants. They drove to the Overnighter Motel in the Fairfield area, where O'Brien registered for a room using money from the victim's purse. Perez and appellant then "ditched" the Mercedes "down the road" and walked back to the hotel. In the hotel room, they started dividing up the stolen jewelry and other property, with each "grabbing" what he could in a "kind of a free for all." O'Brien felt he got the last pick. No one wanted the Nintendo or the less valuable jewelry. O'Brien cleaned the hunting knife which had been used to stab the victim, and threw it into some bushes next to the freeway in Cordelia. In June 1998, O'Brien showed detectives where he had disposed of the knife.

The three used cocaine and drank beer, and tried several times to contact the drug dealer they had intended to rob in Fairfield. After trying without success to reach him by telephone or pager, the three men walked to the home of O'Brien's friend Mabra to see if he would give them a ride back to San Francisco. They used some more cocaine in the car of Mabra's girlfriend, McPhee. After meeting other friends from the area, they went back to the motel room and used more drugs. When these friends also refused to give them a ride, the three went to get the victim's Mercedes, but ran away when they saw that the vehicle was surrounded by police. Eventually, Perez called Hart, who agreed to drive out to Fairfield and pick them up.

Hart arrived in his white Blazer, accompanied by Dawson. O'Brien, appellant and Perez brought the jewelry with them, but left the Nintendo at the hotel. As Hart drove them back, they talked about the jewelry they had stolen. Dawson was angry that they had involved him in their crime to any extent. When they got back to appellant's house in San Francisco, O'Brien saw Hart give Perez some money, and heard appellant trying to sell Hart the large diamond ring and some of the other jewelry. Hart did not buy the diamond ring.

The next day, O'Brien and appellant went to Hart's house in order to obtain some cocaine for two rings and to attempt to negotiate a deal on the large diamond ring. Hart was unwilling to pay appellant what the latter wanted for the ring. A few days later, appellant and O'Brien decided to take BART and try to get to Fairfield to rob the drug dealer, this time without Perez's participation. However, O'Brien was arrested at the Lake Merritt station when he got into a fight with someone on the train. He had the victim's pearl necklace and pearl earrings in his possession at the time, as well as two "throwing" knives. Appellant left the scene.

O'Brien was in jail for 11 days following his arrest on BART. When he went back to appellant's house, appellant's father would not permit him in to retrieve his personal belongings. In June 1998, O'Brien was interrogated by police. He admitted his guilt and Perez's involvement, but tried "covering up for [appellant] a little bit," because appellant "was my really good friend," while O'Brien "didn't know Joseph Perez from anybody."

On March 24, 1999, an indictment was filed in Contra Costa County Superior Court charging appellant, Perez and O'Brien with murder (Pen. Code, § 187,[1] count one); first degree residential robbery (§§ 211, 212.5, count two); first degree residential burglary (§§ 459, 460, subd. (a), count three); and automobile theft (Veh. Code, § 10851, subd. (a), count four). The indictment alleged special circumstances of felony murder during the robbery and burglary (§ 190.2, subd. (a)(17)) in connection with count one. On March 26, 1999, appellant pleaded not guilty and denied the enhancements. On January 16, 2000, appellant moved to sever his trial from that of codefendant Perez. The court granted the motion. At the conclusion of a 14-day jury trial, appellant was found guilty as charged, with the special circumstance allegations found true. On March 2, 2001, the trial court denied appellant's motion for a new trial and imposed a sentence of life in prison without the possibility of parole plus six years. This appeal timely followed.

## NO SUA SPONTE DUTY TO INSTRUCT ON ACCOMPLICE LIABILITY AS TO HART

The trial court instructed the jury that O'Brien—a key witness for the prosecution—was an accomplice in the charged offenses as a matter of law, and his testimony therefore had to be corroborated by other evidence tending to connect appellant to the commission of the crime. In his principal argument, appellant contends the trial court prejudicially erred by failing either to submit to the jury the question of whether or not prosecution witness Hart was also an accomplice in the charged offenses, or to instruct that if Hart was found to be an accomplice, his testimony could neither corroborate nor be corroborated by the testimony of O'Brien.

Section 1111 provides as follows: "A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof. [¶] An accomplice is hereby defined as one who is liable to prosecution *for the identical offense* charged against the defendant on trial in the cause in which the testimony of the accomplice

---

[1] Unless otherwise indicated, all further statutory references are to the Penal Code.

is given." (Italics added.) In order to be chargeable with the identical offense, the witness must be a principal in the crime. (*People v. Horton* (1995) 11 Cal.4th 1068, 1113–1114 [47 Cal.Rptr.2d 516, 906 P.2d 478]; *People v. Fauber* (1992) 2 Cal.4th 792, 833 [9 Cal.Rptr.2d 24, 831 P.2d 249].) Section 31 defines principals to include "[a]ll persons concerned in the commission of a crime . . . whether they directly commit the act constituting the offense, or aid and abet in its commission, or, not being present, have advised and encouraged its commission . . . ." (§ 31.) "A mere accessory . . . is not liable to prosecution for the identical offense, and therefore is not an accomplice." (*People v. Horton, supra,* 11 Cal.4th at p. 1114, citing *People v. Fauber, supra,* 2 Cal.4th at pp. 833–834, and *People v. Hoover* (1974) 12 Cal.3d 875, 879 [117 Cal.Rptr. 672, 528 P.2d 760].)

The trial court gave the jury comprehensive instructions defining principal and accomplice liability, aiding and abetting, and on the necessary corroboration of accomplice testimony, in accordance with CALJIC Nos. 3.00, 3.01, 3.02, 3.10, 3.11, 3.12, 3.14, and 3.18.[2] The trial court specifically instructed, in accordance with CALJIC No. 3.16, that if the charged crimes were committed by anyone, then the witness O'Brien "was an accomplice as a

---

[2] In pertinent part, the trial court's instructions included the following: "An accomplice is a person who by reason of aiding and abetting, or as the actual perpetrator is subject to prosecution for the identical offenses charged against the defendant on trial.

"Merely assenting to or aiding and abetting in the commission of a crime without knowledge of the unlawful purpose of the perpetrator and without the intent or purpose of committing, encouraging, or facilitating in the commission of the crime is not criminal. Thus, a person who assents to or aids or assists in the commission of the crime without that knowledge and without that intent or purpose is not an accomplice in the commission of the crime. [¶] . . . [¶]

"You cannot find a . . . defendant guilty based upon the testimony of an accomplice unless that testimony is corroborated by other evidence which tends to connect the defendant with the commission of the offense.

"Testimony of an accomplice includes any out-of-court statement purportedly made by an accomplice received for the purpose of proving what the accomplice stated . . . out of court was true.

"To corroborate the testimony of an accomplice, there must be evidence of some fact or facts related to the crime which if believed by itself and without any aid, interpretation, or direction from the testimony of the accomplice tends to connect the defendant with the commission of the crime charged.

"However, it is not necessary that the evidence of corroboration be sufficient in itself to establish every element of the crime charged or that it corroborates every fact to which the accomplice testifies. In determining whether an accomplice has been corroborated, you must first assume the testimony of the accomplice has been removed from the case. You must then determine whether there is any remaining evidence which tends to connect the defendant with the commission of the crime.

"If there is no independent evidence which tends to convict [*sic*] the defendant with the commission of the crime, the testimony of the accomplice is not corroborated. If there is independent evidence which you believe, then the testimony of the accomplice is corroborated.

"To the extent that an accomplice gives testimony that tends to incriminate the defendant, it should be viewed with caution. This does not mean, however, that you may arbitrarily

matter of law," and his testimony required corroboration by independent evidence connecting appellant with the commission of the charged offenses.[3] In addition, the trial court gave an instruction based on CALJIC No. 6.40 defining an "accessory" to a felony, and adding the following language from the case law: "A mere accessory is not liable to prosecution for the identical offenses charged against the defendant and, therefore, is not an accomplice."[4]

The trial court did not give the additional instructions which appellant now contends should have been given regarding Hart's alleged accomplice liability. Specifically, appellant complains that the trial court should either have identified Hart as an accomplice as a matter of law (CALJIC No. 3.16), or instructed the jury to determine whether Hart was such an accomplice (CALJIC No. 3.19); and then instructed pursuant to CALJIC No. 3.13 that the corroboration required for the testimony of an accomplice could not be supplied by the testimony of another accomplice, but instead must come from other evidence.[5] Appellant did not request that the trial court give any of these instructions. His contention is that the trial court was obliged to give them sua sponte. Appellant's contention is meritless.

■ " '[W]henever the testimony given upon the trial is sufficient to warrant the conclusion upon the part of the jury that a witness implicating a defendant was an accomplice,' " the trial court must instruct the jury sua sponte to determine whether the witness was an accomplice in the charged offense. (*People v. Bevins* (1960) 54 Cal.2d 71, 76 [4 Cal.Rptr. 504, 351 P.2d 776]; *People v. Zapien* (1993) 4 Cal.4th 929, 982 [17 Cal.Rptr.2d 122, 846 P.2d 704].) By the same token, if the evidence adduced at trial establishes *as*

disregard that testimony. You should give that testimony the weight which you think it deserves after examining it with care and caution, and in light of all the other evidence and all the evidence in this case."

[3] The trial court instructed: "[If] the crimes charged against the defendant were committed by anyone, the witness Maury O'Brien was an accomplice as a matter of law, and his testimony is subject to the rules I've just articulated requiring corroboration."

[4] The trial court gave the following instruction, based in part on CALJIC No. 6.40: "Every person who after a felony has been committed harbors, conceals, or aids a principal in that felony with a specific intent that the principal may avoid or escape from arrest, trial, conviction, or punishment, having knowledge that the principal has committed that felony or has been charged with that felony or convicted thereof, is an accessory to such felony.

"A mere accessory is not liable to prosecution for the identical offenses charged against the defendant and, therefore, is not an accomplice."

The first sentence of this instruction is taken virtually verbatim from CALJIC No. 6.40 and section 32. The concluding sentence is not found in CALJIC No. 6.40, but instead was added by the trial court itself from the case law. (See *People v. Horton, supra,* 11 Cal.4th at p. 1114; *People v. Fauber, supra,* 2 Cal.4th at pp. 833–834; *People v. Hoover, supra,* 12 Cal.3d at p. 879.)

[5] CALJIC No. 3.13 provides: "The required corroboration of the testimony of an accomplice may not be supplied by the testimony of any or all of [his][her] accomplices, but must come from other evidence."

*a matter of law* that a witness was an accomplice to the charged offense, the jury must be so instructed. (*People v. Zapien, supra,* 4 Cal.4th at p. 982; *People v. Robinson* (1964) 61 Cal.2d 373, 394 [38 Cal.Rptr. 890, 392 P.2d 970].) In the absence of a specific request, however, and assuming the standard instructions on accomplice liability and the requirement for corroboration of accomplice testimony are given, a trial court does *not* have a sua sponte duty to give the additional instruction that one accomplice may not corroborate another. (*People v. Sanders* (1995) 11 Cal.4th 475, 533–534 [46 Cal.Rptr.2d 751, 905 P.2d 420].)[6] Appellant's failure to request the subject instructions therefore constitutes a waiver of this issue *unless* the trial evidence and testimony was sufficient either to create a triable issue of fact as to whether Hart was an accomplice to the others in the charged offense, or else established that he was such an accomplice as a matter of law.

■ The evidence in this case was not sufficient to establish either of these preconditions. It was appellant's own burden to establish by a preponderance of the evidence that Hart was an accomplice. (*People v. Frye* (1998) 18 Cal.4th 894, 967–969 [77 Cal.Rptr.2d 25, 959 P.2d 183] [defendant properly required to prove issues collateral to guilt, including accomplice status of a witness, by a preponderance of the evidence]; *People v. Fauber, supra,* 2 Cal.4th at pp. 833–834 [the defendant has the burden of proof by a preponderance of the evidence that a prosecution witness was an accomplice]; *People v. Sully* (1991) 53 Cal.3d 1195, 1228 [283 Cal.Rptr. 144, 812 P.2d 163] ["[d]efendant must establish the accomplice status of a prosecution witness by a preponderance of the evidence"].) In order to prove that Hart was an accomplice whose testimony required corroboration, appellant was required to show that Hart was chargeable as a *principal*—not merely as an

---

[6] Appellant contends that this principle stated in *People v. Sanders, supra,* 11 Cal.4th 475, is not good law. We reject the contention. In the first place, appellant erroneously cites *People v. Zapien, supra,* 4 Cal.4th 929, for the proposition that a trial court is required to instruct the jury sua sponte pursuant to CALJIC No. 3.13 if the evidence either establishes that a witness is an accomplice as a matter of law, or is susceptible to that conclusion. In fact, *Zapien* holds no such thing; it merely repeats the well-established principle that a trial court must give the standard accomplice instructions about viewing the testimony of an accomplice witness with distrust, and requiring corroboration before a defendant can be convicted upon the basis of such testimony. (*Id.* at p. 982.)

In any event we need not address appellant's assertion. Even without regard to appellant's procedural failure to request the subject instructions, on the record before us we conclude that appellant's claim fails on the merits. The instructions given covered the accomplice issue fully, and adequately informed the jury that accomplice testimony had to be corroborated by independent evidence. Although the trial court told the jury that O'Brien was an accomplice as a matter of law, that instruction did not supercede all the other instructions given on the subject. "We are not persuaded that there is a reasonable likelihood that, taken as a whole, the instructions were understood to apply to [O'Brien] alone." (*People v. Sanders, supra,* 11 Cal.4th at p. 534.) The trial court did not err by failing to give an additional instruction that one accomplice's testimony could not be corroborated by that of a fellow accomplice; such an instruction would have been redundant, given the other instructions given.

accessory—with having committed the *identical offense* charged against appellant himself. (§§ 31–33; *People v. Horton, supra,* 11 Cal.4th at p. 1114; *People v. Fauber, supra,* 2 Cal.4th at pp. 833–834; *People v. Sully, supra,* 53 Cal.3d at p. 1227.)

■ An accomplice need not share in the actual perpetration of a crime to be chargeable as a principal therein; liability as an accomplice to a crime may be based on having aided and abetted its commission. However, an aider and abettor is chargeable as a principal only to the extent he or she actually knows and *shares* the full extent of the perpetrator's specific criminal intent, and actively promotes, encourages, or assists the perpetrator with the intent and purpose of advancing the perpetrator's successful commission of the target offense. (*People v. Beeman* (1984) 35 Cal.3d 547, 560 [199 Cal.Rptr. 60, 674 P.2d 1318].)[7] It is not sufficient if the person simply gives assistance with knowledge of the perpetrator's criminal purpose. Merely giving assistance without sharing the perpetrator's purpose and intent establishes liability only as an accessory, not as an accomplice. (*People v. Sully, supra,* 53 Cal.3d at p. 1227, ["An aider and abettor is chargeable as a principal, but his liability as such depends on whether he promotes, encourages, or assists the perpetrator and *shares* the perpetrator's criminal purpose. [Citation.] It is not sufficient that he merely gives assistance with knowledge of the perpetrator's criminal purpose"]; *People v. Stankewitz* (1990) 51 Cal.3d 72, 90 [270 Cal.Rptr. 817, 793 P.2d 23] [presence at scene of crime or failure to prevent commission of crime insufficient to establish aiding and abetting]; *People v. Tewksbury* (1976) 15 Cal.3d 953, 960 [127 Cal.Rptr. 135, 544 P.2d 1335] ["[c]riminal liability as a principal attaches to those who aid in the commission of a crime only if they also share in the criminal intent"]; *People v. Hoover, supra,* 12 Cal.3d at p. 879 [assisting principal to escape does not result in liability as principal or aider and abettor, but merely as accessory].)

■ A mere accessory is not liable as an accomplice (*People v. Horton, supra,* 11 Cal.4th at p. 1114), and a court is not obligated to give an accomplice instruction when the evidence establishes that the witness was merely an accessory. (*People v. Soto* (1999) 74 Cal.App.4th 1099, 1101 [88 Cal.Rptr.2d 688].)

There is no dispute as to the relevant facts or inferences bearing on the issue of whether Hart was an accomplice or merely an accessory in this case. Although Hart did have advance knowledge of the plan to rob a Fairfield

---

[7] "[T]he aider and abettor must share the specific intent of the perpetrator. By 'share' we mean neither that the aider and abettor must be prepared to commit the offense by his or her own act should the perpetrator fail to do so, nor that the aider and abettor must seek to share the fruits of the crime. [Citation.] Rather, an aider and abettor will 'share' the perpetrator's specific intent when he or she knows the full extent of the perpetrator's criminal purpose and gives aid or encouragement with the intent or purpose of facilitating the perpetrator's commission of the crime. [Citations.]" (*People v. Beeman, supra,* 35 Cal.3d at p. 560.)

drug dealer, there was no evidence he conspired with the others to commit that crime. Hart and O'Brien both testified that Hart expressly refused to become involved in the planned drug dealer robbery. The extent of his participation was giving O'Brien, appellant and Perez a lift to the Balboa Park BART station, and expressing interest in buying stolen drugs from them should the robbery succeed. Had the projected robbery of the Fairfield drug dealer actually taken place, this participation may have sufficed to make him an accessory. (*People v. Sully, supra,* 53 Cal.3d at p. 1227 [to be liable as principal, aider and abettor must actually share perpetrator's criminal purpose, and not merely give assistance with knowledge thereof].) But the Fairfield robbery did not occur, and no conspiracy to commit such a crime was even charged in this case.

There was *no* evidence to support Hart's involvement in the actual offenses charged against appellant. Hart could not have had any advance knowledge of the home invasion burglary, robbery and murder in Lafayette, because the principals themselves did not even get the idea of committing those crimes until after they reached the Lafayette BART station. The burglary, robbery and murder of the victim in her Lafayette home was completely unrelated to the perpetrator's original plan. There was no conspiracy incorporating both the projected Fairfield crime and the actual Lafayette burglary and murder. The actual crime committed was one of chance opportunity, and constituted an interruption in the course of the execution of the principals' original plan. After committing the crimes in Lafayette, the principals proceeded to pick up where they had left off, fully intending to continue on to Fairfield to rob the drug dealer as planned. Hart never learned about what had happened in Lafayette until after he picked the principals up in Cordelia later that night, long after the completion of the offenses charged in this case. Even if we assume from the evidence that Hart shared to some extent in the intent to rob the Fairfield drug dealer, the evidence does not support any rational inference that he also shared in the principals' specific criminal intent to commit the home invasion burglary, robbery and murder which actually occurred. Hart had no knowledge of a plan to break into a home, rob and murder an innocent victim at any point until after that took place, and there is no evidence he shared in the criminal intent to do so at any point. The fact he picked the principals up afterwards—before he knew what they had done— and later agreed to purchase some of the jewelry they had stolen, makes him an accessory after the fact to the charged offenses. On this *undisputed* record, there was no question of fact for the jury to decide as to Hart's alleged accomplice status.

Even if we were to assume there might possibly be some issue of fact as to whether Hart could be considered an aider and abettor of the charged offense—an assumption we emphatically reject—any possible error in failing to submit the issue to the jury was clearly harmless. ■ Failure to give

accomplice instructions is not prejudicial where there is sufficient corroborating evidence connecting the defendant to the charged offense independently of the witness's testimony. (*People v. Frye, supra,* 18 Cal.4th at pp. 965–966; *People v. Arias* (1996) 13 Cal.4th 92, 142–143 [51 Cal.Rptr.2d 770, 913 P.2d 980]; *People v. Zapien, supra,* 4 Cal.4th at pp. 982–983.) Corroboration may be established entirely by circumstantial evidence. (*People v. Thurman* (1972) 28 Cal.App.3d 725, 729–730 [104 Cal.Rptr. 804].) The evidence "need only be slight" (*People v. Frye, supra,* 18 Cal.4th at p. 966), "entitled to little consideration when standing alone" (*People v. Tewksbury, supra,* 15 Cal.3d at p. 969), and corroborative of only a portion of the accomplice's testimony. (*People v. Thurman, supra,* 28 Cal.App.3d at pp. 729–730.)

■ The evidence in this case was sufficient to corroborate the testimony of both Hart and O'Brien, independently of their own respective testimony. Appellant's presence at the scene of the crime is corroborated by the circumstantial evidence of the two shoeprints found in the victim's home, matching the size, pattern and type of appellant's athletic shoes. The manner of the victim's death, as testified to by O'Brien, is corroborated by the evidence found by the police in the victim's bedroom, and by the autopsy establishing the use of the telephone cord to strangle her. The principals' theft of the victim's jewelry is corroborated by the fact rings purchased by Hart from the principals belonged to the victim, and by Torres' testimony about seeing the victim's uniquely shaped large diamond ring in appellant's possession. The presence of cocaine in the victim's Mercedes SUV corroborated O'Brien's testimony about the principals' cocaine use. O'Brien's presence at the Overnighter Motel in Cordelia is confirmed by the registration card he filled out there on the night of the murder. The testimony of both Mabra and McPhee confirms appellant's presence together with O'Brien and Perez in Cordelia not long after the murder, their use of drugs, and their desire for a ride back to San Francisco. Finally, Dawson—a person completely unrelated to the crimes—testified that the three principals had bragged about their crimes during the ride back to San Francisco. Although Dawson could not identify the three, his testimony nonetheless circumstantially supported the testimony of both Hart and O'Brien about the return trip. All of this evidence amply corroborates the testimony of both Hart and O'Brien, and renders harmless any possible error in failing to give the instructions now at issue.

## NO INEFFECTIVE ASSISTANCE OF COUNSEL

Appellant next contends that he received ineffective assistance of counsel because of his trial attorney's failure to request jury instructions on Hart's status as an alleged accomplice and on the bar against cross-corroboration by accomplices. The contention is meritless.

■ Appellant has the burden of proving his claim of ineffective or inadequate assistance of counsel. There are two elements of ineffective assistance of counsel, both of which he must establish. First, appellant must show that "trial counsel failed to act in a manner to be expected of reasonably competent attorneys acting as diligent advocates"; that is, that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms. Second, trial counsel's acts or omissions must have "resulted in the withdrawal of a potentially meritorious defense"; that is, there must be a reasonable probability that the result of trial would have been more favorable for appellant but for counsel's deficient representation. (*People v. Pope* (1979) 23 Cal.3d 412, 424–425 [152 Cal.Rptr. 732, 590 P.2d 859]; *People v. Bell* (1989) 49 Cal.3d 502, 546 [262 Cal.Rptr. 1, 778 P.2d 129].)

■ In order to show deficient representation, appellant "must 'affirmatively show that the omissions of defense counsel involved a crucial issue, and that the omissions cannot be explained on the basis of any knowledgeable choice of tactics.' [Citation.]" (*People v. Jackson* (1980) 28 Cal.3d 264, 289 [168 Cal.Rptr. 603, 618 P.2d 149], disapproved on other grounds in *People v. Cromer* (2001) 24 Cal.4th 889, 901 [103 Cal.Rptr.2d 23, 15 P.3d 243].) Our scrutiny of defense counsel's performance must be highly deferential, indulging a strong presumption that his conduct fell within the broad range of reasonable professional assistance. (*Strickland v. Washington* (1984) 466 U.S. 668, 689 [80 L.Ed.2d 674, 104 S.Ct. 2052].) " 'When a defendant makes an ineffectiveness claim on appeal, the appellate court must look to see if the record contains any explanation for the challenged aspects of representation. If the record sheds no light on why counsel acted or failed to act in the manner challenged, "unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation" [citation], the contention must be rejected.' [Citation.] A reviewing court will not second-guess trial counsel's reasonable tactical decisions. [Citation.]" (*People v. Kelly* (1992) 1 Cal.4th 495, 520 [3 Cal.Rptr.2d 677, 822 P.2d 385].)

■ With regard to prejudice, appellant must affirmatively prove a reasonable probability that a determination more favorable to his or her interests would have resulted in the absence of trial counsel's failings. (*People v. Fosselman* (1983) 33 Cal.3d 572, 584 [189 Cal.Rptr. 855, 659 P.2d 1144].) " 'It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding. . . . The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' [Citations.]" (*People v. Ledesma* (1987) 43 Cal.3d 171, 217–218 [233 Cal.Rptr. 404, 729 P.2d 839]; see *People v. Bolin* (1998)

18 Cal.4th 297, 333 [75 Cal.Rptr.2d 412, 956 P.2d 374]; *People v. Wharton* (1991) 53 Cal.3d 522, 575–576 [280 Cal.Rptr. 631, 809 P.2d 290]; *People v. Karis* (1988) 46 Cal.3d 612, 657 [250 Cal.Rptr. 659, 758 P.2d 1189].)[8]

Here, the record shows appellant's trial counsel asked the trial court to instruct the jury that Hart was an accomplice as a matter of law, but the trial court declined to do so. Appellant has not provided this court with trial counsel's own explanation for his failure to make a further request that the trial court submit the question of Hart's accomplice status to the jury and give the CALJIC No. 3.13 instruction barring cross-corroboration by accomplices. Because trial counsel was not asked for an explanation, and the record does not shed any light on his motivation, we must reject appellant's present claim of defective assistance unless there simply could be no satisfactory explanation. (*People v. Kelly, supra,* 1 Cal.4th at p. 520.)

 That is not the case here. Trial counsel was not required to request the instruction that the testimony of O'Brien and Hart both be independently corroborated. The trial court's instruction that O'Brien was an accomplice as a matter of law, and its refusal to give a similar instruct on Hart's status, did not preclude the jury from finding that Hart was also an accomplice; it merely dictated that O'Brien was an accomplice, and left the jury free to conclude on the basis of the evidence that other witnesses, including Hart, were also accomplices. The decision not to pursue additional instructions was not an incompetent one, since the issue of accomplice status had already been adequately explained to the jury. Trial counsel may have decided the standard instructions given sufficiently explained the matter to the jury. Because the record discloses no explanation why counsel did not make the subject request, we must give deference to trial counsel's decision. (*Strickland v. Washington, supra,* 466 U.S. at p. 689; *People v. Bolin, supra,* 18 Cal.4th at p. 333.)

In any event, any omission was clearly not prejudicial. The trial court informed the jury that all accomplice testimony must be viewed with caution

---

[8] In order to prevail upon a claim of ineffective assistance of counsel, appellant "must establish not only deficient performance, i.e., representation below an objective standard of reasonableness, but also resultant prejudice. [Citation.] Tactical errors are generally not deemed reversible, and counsel's decision making must be evaluated in the context of the available facts. [Citation.] To the extent the record on appeal fails to disclose why counsel acted or failed to act in the manner challenged, we will affirm the judgment 'unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation . . . .' [Citation.] Finally, prejudice must be affirmatively proved; the record must demonstrate 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' [Citations.]" (*People v. Bolin, supra,* 18 Cal.4th at p. 333; *Strickland v. Washington, supra,* 466 U.S. at p. 694; *People v. Ledesma, supra,* 43 Cal.3d at pp. 216–218.)

and independently corroborated. There was a great deal of corroboration in this case, from both physical evidence and eyewitness testimony. It is not reasonably probable that a different result more favorable to appellant would have occurred had defense counsel requested the instructions now at issue. (*People v. Bolin, supra,* 18 Cal.4th at p. 333; *People v. Wharton, supra,* 53 Cal.3d at pp. 575–576; *People v. Karis, supra,* 46 Cal.3d at p. 657; *People v. Ledesma, supra,* 43 Cal.3d at pp. 217–218.)

## INSTRUCTIONS ON RECENT POSSESSION OF STOLEN PROPERTY PROPERLY GIVEN

Finally, appellant contends that the trial court erroneously instructed the jury pursuant to CALJIC No. 2.15 on possession of stolen property. He argues that the instruction unconstitutionally lightened the prosecution's burden of proof on an element of the charge of felony murder, and on the special circumstance alleged in connection therewith. Appellant is wrong.

At issue is the following instruction: "If you find . . . that the defendant was in conscious possession of recently stolen property, the fact of that possession is not by itself sufficient to permit an inference that the defendant is guilty of the crime of robbery and/or burglary. Before guilt may be inferred, there must be corroborating evidence tending to prove the defendant's guilt. However, this corroborating evidence need only be slight and need not by itself be sufficient to warrant an inference of guilt.

"As corroboration, you may consider the attributes of possession, for example, time, place, and manner. You may also consider whether the defendant had an opportunity to commit the crime charged, the defendant's conduct, any statements the defendant may have made with reference to the property, and any other evidence which tends to connect the defendant with the crime charged."

Appellant made no objection to this instruction. On appeal, he acknowledges that the instruction is designed "partly as a prophylactic in favor of the accused," since it admonishes the jury of "the well-established principle that evidence of possession of recently stolen property, standing alone, will not support a conviction for a theft crime; there must be some other corroborating evidence." Moreover, appellant also concedes the instruction is predicated on "the well accepted" principle that a defendant's possession of recently stolen property is by itself sufficiently incriminating to warrant conviction, if coupled with only "slight" corroboration by other inculpatory circumstances tending to show guilt. (*People v. Barker* (2001) 91 Cal.App.4th 1166, 1173 [111 Cal.Rptr.2d 403]; *People v. McFarland* (1962) 58 Cal.2d 748, 754 [26 Cal.Rptr. 473, 376 P.2d 449].) Appellant argues, however, that the instruction

was erroneously given in this case because it could be interpreted in such a way as to permit the jury to convict him of first degree felony murder—and impose the special circumstance alleged in connection with that crime—on the basis of only slight corroborative evidence by itself insufficient to warrant an inference of guilt. In this way, appellant urges, the instruction impermissibly lightened the prosecution's burden of proof of felony *murder*, thereby violating his constitutional right to proof beyond a reasonable doubt of each element of that offense and the related sentencing enhancement.

Appellant's argument does not withstand scrutiny. The use of CALJIC No. 2.15 has repeatedly withstood constitutional attack and been approved in cases in which the theft-related offense set out in the instruction itself was the predicate felony for a felony-murder charge and constituted the basis for a murder conviction on that theory. (*People v. Mendoza* (2000) 24 Cal.4th 130, 176–177 [99 Cal.Rptr.2d 485, 6 P.3d 150]; *People v. Smithey* (1999) 20 Cal.4th 936, 975–978 [86 Cal.Rptr.2d 243, 978 P.2d 1171]; *People v. Holt* (1997) 15 Cal.4th 619, 677 [63 Cal.Rptr.2d 782, 937 P.2d 213]; *People v. Johnson* (1993) 6 Cal.4th 1, 37–38 [23 Cal.Rptr.2d 593, 859 P.2d 673]; *People v. Lang* (1989) 49 Cal.3d 991, 1024 [264 Cal.Rptr. 386, 782 P.2d 627]; *People v. Esquivel* (1994) 28 Cal.App.4th 1386, 1400–1401 [34 Cal.Rptr.2d 324]; but see *People v. Barker, supra,* 91 Cal. App.4th at pp. 1172–1177 [giving the CALJIC No. 2.15 instruction with the inclusion of a direct reference to nontheft offenses such as murder was erroneous].)

 These cases confirm that CALJIC No. 2.15 does not create an improper presumption of guilt arising from the mere fact of possession of stolen property, or reduce the prosecution's burden of proof to a lesser standard than beyond a reasonable doubt. Rather, the instruction "relates a contrary proposition: a burglary [or robbery] may not be presumed from mere possession unless the commission of the offense is corroborated." (*People v. Johnson, supra,* 6 Cal.4th at p. 37.) The inference permitted by CALJIC No. 2.15 is permissive, not mandatory. Because a jury may accept or reject a permissive inference "based on its evaluation of the evidence, [it] therefore does not relieve the People of any burden of establishing guilt beyond a reasonable doubt." (*People v. Anderson* (1989) 210 Cal.App.3d 414, 427–430 [258 Cal.Rptr. 482].) Requiring only "slight" corroborative evidence in support of a permissive inference, such as that created by possession of stolen property, does not change the prosecution's burden of proving every element of the offense, or otherwise violate the accuser's right to due process unless the conclusion suggested is not one that reason or common sense could justify in light of the proven facts before the jury. (*Francis v. Franklin* (1985) 471 U.S. 307, 314–315 [85 L.Ed.2d 344, 105 S.Ct. 1965]; *Ulster County Court v. Allen* (1979) 442 U.S. 140, 167 [60 L.Ed.2d 777, 99 S.Ct. 2213]; *People v. Holt, supra,* 15 Cal.4th at p. 677; *People v. McFarland, supra,*

58 Cal.2d at pp. 754–756; *People v. Gamble* (1994) 22 Cal.App.4th 446, 454–455 [27 Cal.Rptr.2d 451].)[9]

In the recent case of *People v. Prieto* (2003) 30 Cal.4th 226 [133 Cal.Rptr.2d 18, 66 P.3d 1123], our Supreme Court held that it was error to give CALJIC No. 2.15 in a felony murder case without limiting the instruction to the theft-related offenses charged in the case. In *Prieto*, the case against the defendant included charges of kidnapping, rape and murder in addition to robbery. The trial court gave a modified version of CALJIC No. 2.15 specifically instructing the jury that if they found the defendant was " 'in conscious possession of recently stolen property, the fact of such possession [was] not by itself sufficient to permit an inference that [the defendant] is guilty of the *crimes charged*.' " (*Id.* at p. 248, italics added by *Prieto* court.) Because the "crimes charged" in the case included rape and murder, the Supreme Court concluded that the instruction was improper; and it held that a trial court's application of CALJIC No. 2.15 to nontheft offenses like rape or murder is erroneous. In so holding, the Supreme Court followed the earlier conclusion of the Court of Appeal in *Barker, supra,* 91 Cal.App.4th at pp. 1172–1176. (*People v. Prieto, supra,* 30 Cal.App.4th at pp. 248–249.)[10]

*Prieto* is distinguishable from and inapplicable to this case. Unlike the instruction at issue in *Prieto*, which broadly referenced all the non-theft charges in the case including murder, the instruction given here pursuant to CALJIC No. 2.15 *was* specifically limited to describing the circumstances in which the jury could draw an inference of appellant's guilt "of the crime of

---

[9] "A mandatory presumption instructs the jury that it must infer the presumed fact if the State proves certain predicate facts. A permissive inference suggests to the jury a possible conclusion to be drawn if the State proves predicate facts, but does not require the jury to draw that conclusion. [¶] Mandatory presumptions . . . violate the Due Process Clause if they relieve the State of the burden of persuasion on an element of an offense. [Citations.] A permissive inference does not relieve the State of its burden of persuasion because it still requires the State to convince the jury that the suggested conclusion should be inferred based on the predicate facts proved. . . . A permissive inference violates the Due Process Clause only if the suggested conclusion is not one that reason and common sense justify in light of the proven facts before the jury. [Citation.]" (*Francis v. Franklin, supra,* 471 U.S. at pp. 314–315.)

[10] "Nonetheless, we agree with defendant that the trial court's application of CALJIC No. 2.15 to nontheft offenses like rape or murder was erroneous. We have approved the use of CALJIC No. 2.15 with respect to theft offenses because '[w]ith the inference from the knowledge and conscious possession of [stolen] property, and slight additional evidence as corroboration, the intent to steal, identity, and the determination a defendant committed the acts necessary to constitute robbery and burglary have been found to naturally and logically flow . . . .' [Citation.] The same is not true for nontheft offenses like rape or murder. As explained in *Barker,* '[p]roof a defendant was in conscious possession of recently stolen property simply does not lead naturally and logically to the conclusion the defendant committed' a rape or murder. [Citation.] We therefore find the trial court's inclusion of nontheft offenses like rape and murder in CALJIC No. 2.15 erroneous." (*People v. Prieto, supra,* 30 Cal.4th at pp. 248–249.)

*robbery and/or burglary.*" (Italics added.) Nothing in the Supreme Court's analysis in *Prieto* would apply its holding in that case to the facts before us, in which the instruction specified only the theft-based charges.[11]

Even if there was any error in giving the subject instruction, the error was harmless. Jury instructions must be considered in their entirety, and not in isolation. (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1248 [74 Cal.Rptr.2d 212, 954 P.2d 475]; *People v. Crandell* (1988) 46 Cal.3d 833, 874 [251 Cal.Rptr. 227, 760 P.2d 423]; *People v. Morris* (1988) 46 Cal.3d 1, 41 [249 Cal.Rptr. 119, 756 P.2d 843] [improper use of CALJIC No. 2.15 harmless error because of other instructions given by trial court], disapproved on other grounds in *In re Sassounian* (1995) 9 Cal.4th 535, 545, fn. 6 [37 Cal.Rptr.2d 446, 887 P.2d 527].) In its other instructions, the trial court admonished the jury of its responsibility to evaluate the evidence in its totality, to decide all questions of fact, to assign every part of the instructions equal importance, to give appellant the presumption of innocence, and to convict only if the prosecution bore its burden of proving guilt beyond a reasonable doubt. The court specifically instructed that an inference is a

---

[11] In his reply brief, appellant argues that the situation in this case is analogous to that addressed by this court's decision in *People v. James* (2000) 81 Cal.App.4th 1343 [96 Cal.Rptr.2d 823]. In *James*, we held that by informing the jury it "may" infer a defendant was disposed to commit *"and did* commit" the charged offense from a finding he had committed other similar offenses, the instruction there at issue improperly "prompted" the jury " to use evidence of prior offenses in precisely the wrong way, as a substitute for proof of the current offense." (*Id.* at p. 1353.) Appellant now argues that by informing jurors they could infer guilt of robbery or burglary from possession of recently stolen property combined with "slight" corroborative evidence, CALJIC No. 2.15 similarly permits conviction on the basis of evidence otherwise insufficient to meet the prosecution's burden of proving the elements of the charged offense beyond a reasonable doubt. Specifically, appellant asserts, "any instruction that suggests to the jurors that any given piece or pieces of circumstantial evidence can establish an element of the crime or the crime itself is an instruction that 'prompts' the jury to substitute that evidence for proof beyond a reasonable doubt."

We reject the asserted analogy between the instruction given in this case and that found wanting in *James*. In the first place, CALJIC No. 2.15 does not tell the jury it may infer guilt of the charged offense from entirely collateral evidence of a defendant's propensity to commit that kind of crime as shown by his commission of similar offenses in the past. More broadly, unlike the instruction at issue in *James*, CALJIC No. 2.15 does not "prompt" the jury to substitute otherwise inadequate evidence "as a substitute for proof of the current offense" beyond a reasonable doubt. (*James, supra,* 81 Cal.App.4th at p. 1353.) A permissive inference, like that permitted by CALJIC No. 2.15, simply empowers a jury to credit or reject the inference based on its evaluation of the evidence, and does not shift the burden of proof or otherwise relieve the prosecution of its burden of establishing guilt beyond a reasonable doubt. Use of this permissive inference comports with due process unless there is no rational way for the jury to make the logical connection which the presumption permits. On this basis, as the appellate courts of this state have repeatedly affirmed, CALJIC No. 2.15 is a correct statement of the law. (*People v. Hernandez* (1995) 34 Cal.App.4th 73, 81 [40 Cal.Rptr.2d 223]; *People v. Esquivel, supra,* 28 Cal.App.4th at pp. 1400–1401; *People v. Gamble, supra,* 22 Cal.App.4th at pp. 454–455; *People v. Anderson, supra,* 210 Cal.App.3d at pp. 426–432.)

logical and reasonable deduction which may be drawn from proven facts; that circumstantial evidence is evidence from which an inference "may" be drawn; and that when circumstantial evidence is equally susceptible to two reasonable interpretations, the jury was required to adopt that pointing to innocence. Viewing all these instructions as a whole, rather than viewing CALJIC No. 2.15 in isolation, we conclude that the giving of the subject instruction did not lessen the prosecution's burden of proof on the charged offense of felony murder and the special circumstance connected therewith. (See *People v. Barker, supra,* 91 Cal.App.4th at p. 1177.)

Reversal is not required for another reason. There is no reasonable probability a result more favorable to appellant would have occurred had the trial court not given the CALJIC No. 2.15 instruction in this case. Even without the permissive inference arising from appellant's unexplained possession of jewelry stolen from the victim, the other evidence of appellant's participation in the crime was strong. Most notably, the jury's special circumstance finding that appellant committed the murder during the commission of the burglary and robbery makes clear that the jury accepted the substance of O'Brien's testimony regarding appellant's involvement in the incident. Based on the jury's acceptance of O'Brien's testimony, as independently corroborated by the testimony of other witnesses and the physical evidence of the shoeprint found at the scene matching appellant's shoes, there is no reasonable likelihood that it would have rendered a verdict more favorable to appellant had the trial court omitted the CALJIC No. 2.15 instruction.

## DISPOSITION

The judgment is affirmed.

Parrilli, J., and Pollak, J., concurred.

A petition for a rehearing was denied November 5, 2003, and appellant's petition for review by the Supreme Court was denied February 4, 2004. George, C. J., did not participate therein.