Filed 3/7/14  P. v. Wooten CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>MIGUEL WOOTEN,<br><br>        Defendant and Appellant. | A133860<br><br>(Alameda County<br>Super. Ct. No. 161722) |

## I. INTRODUCTION

Appellant and a man named William Johnson dated the same woman for a short time.  After the woman broke up with Johnson, appellant heard that Johnson had threatened to kill him or have him killed.  Appellant later shot and killed Johnson, and was convicted of first degree murder.

On appeal, appellant contends: (1) his trial counsel was ineffective in failing to move to suppress appellant's confession as the product of an illegal arrest and detention; (2) the trial court erred in failing to give accomplice testimony jury instructions regarding the testimony of appellant's friend who drove him to the scene of the shooting; (3) appellant's trial counsel rendered ineffective assistance by failing to request a jury instruction that provocation can reduce first degree murder to second degree murder, and the trial court erred in failing to give the instruction sua sponte; and (4) the first degree

1

murder conviction is not supported by sufficient evidence of premeditation and deliberation. We reject these contentions, and affirm the judgment.[1]

## II. FACTS AND PROCEDURAL BACKGROUND

### A. Events Leading to the Homicide

For a period of about six months in 2007, appellant and Johnson both dated the same woman, O.M.[2] O.M.'s relationship with appellant lasted from 2004 to early 2009; it was not continuous, but it both predated her relationship with Johnson, and outlasted it. Johnson was a friend of O.M.'s brother, and lived in O.M.'s neighborhood in Oakland, whereas appellant lived in San Jose.

Sometime in mid-2008, after O.M. stopped seeing Johnson, appellant got into an argument with Johnson, whom he had never met before that day, near O.M.'s home on 64th Street in Oakland.[3] The argument developed into a physical confrontation, but O.M. and her mother broke up the fight. Later the same day, as O.M.'s mother was about to drive appellant to his home in San Jose, a group of men from Johnson's neighborhood dragged appellant out of O.M.'s mother's car and beat him until O.M.'s mother managed to stop them. Around the same time, but before the fight, appellant heard reports of threats against him; received an anonymous phone call from the 510 area code telling him to stay away from the 64th Street neighborhood in Oakland; and was told that Johnson had "put a hit out" on him. After that, appellant avoided going to that area.

Appellant testified that on September 21, 2008, the day of the homicide, he took public transportation from his home in San Jose to Oakland to visit a friend, and smoked marijuana with him. Appellant then walked from his friend's house to 62nd Street, near

---

[1] Appellant also filed a petition for writ of habeas corpus, which we ordered considered together with this appeal. (*In re Wooten*, A138377, order filed April 16, 2013.) We are disposing of the petition by separate order filed on this date.

[2] O.M. was not involved in appellant's crime, even as an eyewitness. We refer to her by her initials to protect her privacy.

[3] O.M. said the confrontation between appellant and Johnson occurred in June 2008, but appellant testified it happened about two weeks before September 21, 2008.

MacArthur, to meet a woman named Jasmine who had agreed to give him $100. Appellant said he only knew Jasmine casually, and was evasive when asked to explain why she wanted to give him the money. The place where appellant agreed to meet Jasmine was near O.M.'s 64th Street neighborhood, but appellant said he took "back roads" in order to avoid passing through that area on his way there.

After appellant met Jasmine, he began walking along MacArthur, intending to go to the Coliseum BART station in order to return to San Jose. While on MacArthur, he ran into a high school friend of his named Jarvis Toussaint. Toussaint was driving in his white Buick near the area of Seminary and MacArthur in Oakland. Toussaint was planning on going to San Jose, and appellant asked him for a ride. They stopped at a nearby gas station to get gas for the trip. According to appellant, the stop was Toussaint's idea.

As appellant and Toussaint were entering the gas station parking lot, they spotted Johnson, who was sitting half in and half out of the back seat of a parked white Lexus, talking on the phone. Toussaint testified that when appellant noticed Johnson, appellant started to look nervous and afraid, as if he had seen a ghost. Appellant also testified that seeing Johnson scared him, because he believed that Johnson had threatened his life. Nonetheless, appellant told Toussaint to stop his Buick next to the Lexus. The two cars ended up positioned close together, with the Lexus on the passenger side of Toussaint's Buick.

According to both Toussaint and appellant, their encounter with Johnson was entirely unplanned. Surveillance cameras at the gas station showed Toussaint's Buick in the gas station parking lot before the shooting. The cameras also showed a man in a green shirt purchasing something at the station's convenience store shortly before the shooting. The prosecution contended that the man was Toussaint, and argued that Toussaint had been to the gas station and seen Johnson before he picked up appellant, and that the two men returned to the gas station for the purpose of finding Johnson so that

3

appellant could shoot him.[4] Toussaint denied this, however, saying that he only cut through the station's parking lot, did not purchase anything there, and did not notice anyone in the white Lexus.

When Johnson saw appellant at the gas station, Johnson got out of the Lexus and came towards Toussaint's Buick, holding his hand near the waistband of his pants, and the two men exchanged words in a hostile manner. Both Toussaint and appellant perceived Johnson's approach as threatening, and interpreted the position of Johnson's hand as possibly meaning Johnson was about to pull a gun out of his waistband, although they did not actually see a gun in Johnson's possession. Toussaint and appellant were both afraid that Johnson would shoot them. No evidence was introduced at appellant's trial that established whether or not Johnson actually had a gun when he was shot.

As Johnson approached Toussaint's car, appellant grabbed a gun. According to appellant, the gun belonged to Toussaint, and was already lying next to the parking brake of Toussaint's car when appellant first got in. According to Toussaint, it was not his gun, and he had no idea where it came from; he acknowledged, however, that he did not see it in appellant's possession before the shooting.

When Johnson saw the gun in appellant's hand, he turned around and started to get back into the Lexus. Nonetheless, appellant shot Johnson several times. Appellant testified he did not intend to kill Johnson, and did not aim the gun at any particular target, but simply pointed the gun in Johnson's general direction and fired it.[5] One shot hit the back of Johnson's torso, and the other entered the back of his head. Appellant and Toussaint only remembered appellant firing three shots, but five bullet casings were

---

[4] The prosecutor acknowledged in closing argument that the evidence for this proposition was inconclusive. He argued, however, that even if appellant did not know Johnson was at the gas station until he and Toussaint drove in, the jury should still find premeditation and deliberation. The factual basis for this argument is discussed *post* in connection with appellant's contention that there was insufficient evidence of premeditation and deliberation.

[5] Appellant testified that he did not own a gun and had never carried one. Although he had fired a gun into the air, he had never aimed one at a target.

4

found at the scene, all from the same gun. As Toussaint pulled out of the gas station parking lot, appellant continued shooting, and in his rear view mirror, Toussaint saw Johnson fall to the ground.

Johnson died of multiple gunshot wounds. Forensic testing revealed that he had traces of cocaine and MDMA (ecstasy) in his system, sufficient that he could have been feeling the effect of the drugs at the time he was killed.

## B. Initial Police Investigation

The shooting and some of the events leading up to it were captured on the gas station's surveillance video. From the video, police were able to identify both the Buick from which the shots originated, and the Lexus in which Johnson had been sitting. However, they could not see either the driver of the Buick or the shooter, at least not well enough to identify them.

The Lexus was located nearby, soon after the shooting, with two flat tires, a bullet hole in the back of the driver's headrest, blood on the rear seat, and a bullet on the floor. No one was near it at the time. The police were able to identify Antoine Knox as the man who had driven the Lexus to the location where Johnson was shot. Knox was able to describe the people in the car from which the shots originated, but did not know their names.[6] The other passenger in the Lexus at the time of the shooting was never identified.

A few days after the shooting, the police stopped Toussaint's car while he was driving it, because the car looked like the one in the video. The police then interviewed Toussaint about the shooting, and he told them appellant was the shooter. However, the investigating officer did not believe Toussaint's word alone constituted probable cause to arrest appellant, so the matter was not pursued at that time.

## C. Appellant's Arrest and Confession

Appellant was not contacted by the police until around 8:00 p.m. on February 3, 2009. At that time, appellant had driven his mother's car to Oakland, and parked it in the

---

[6] Knox was later killed, prior to appellant's trial, in an unrelated incident.

parking lot of a liquor store. Appellant and Toussaint were outside the store when two police officers arrived to investigate a complaint about a group of people hanging around in the parking lot. When the police arrived, the crowd started to break up, and appellant and Toussaint headed for appellant's mother's car. One of the officers saw Toussaint open the front passenger door, lean down as if placing something in the car, and then close the door. Toussaint then walked into the liquor store. As appellant was getting into the car on the driver's side, the officer saw a gun on the floor of the car, so he went into the store to detain Toussaint, while his partner detained appellant.[7]

The officers found photographs of the gun on Toussaint's cell phone. The police arrested Toussaint for possession of the gun, and arrested appellant "for allowing someone in his car to have a gun." Both men were taken to jail.

The day after appellant was arrested, the officer who was investigating Johnson's killing obtained a court order authorizing him to take appellant out of jail and bring him to the police department for an interview about the homicide. The interview started around 9:00 p.m. on February 4, 2009, and lasted until about 7:00 a.m. the following morning. During the interview, appellant was shown excerpts from Toussaint's videotaped interview in which Toussaint named appellant as the person who shot Johnson. Ultimately, appellant admitted he shot Johnson. Appellant explained he had heard rumors that Johnson was going to have him killed, so when he ran into Johnson, appellant decided to act first.

### D. Trial Court Proceedings

On August 31, 2009, appellant was charged with murder (Pen. Code, § 187, subd. (a)[8]), with an enhancement for personal and intentional discharge of a firearm, causing death (former §§ 12022.5, subd. (a), 12022.7, subd. (a), 12022.53, subds. (b), (c),

---

[7] The gun was not the same one that killed Johnson, which was never found.

[8] All further statutory references are to the Penal Code unless otherwise noted.

6

(d), (g)[9]).  Appellant was tried by a jury in September 2011, and convicted of first degree murder; the firearm enhancement was found true.  On November 18, 2011, the trial court sentenced appellant to 25 years to life for the murder, with a consecutive term of 25 years to life for the firearm enhancement, for an aggregate term of 50 years to life.  Appellant filed his notice of appeal on the same day.

### III. DISCUSSION

### A. Failure to Move to Suppress Confession Based on Illegal Detention

Appellant was given *Miranda* warnings at the start of his police interview on February 4, 2009, and waived his right to remain silent.  Prior to appellant's trial, his counsel moved to suppress his confession on the ground that the *Miranda* warnings were not properly administered.  The motion was denied.  Appellant now argues that his trial counsel rendered ineffective assistance by not moving to suppress his confession on an additional ground, to wit, that it was the product of an illegal arrest and detention.

In order to establish ineffective assistance of counsel on direct appeal, a criminal defendant must show both that his or her trial counsel's performance was not reasonably competent, and that there is a reasonable probability that the result of the proceeding would have been different if trial counsel had not made the errors the defendant asserts. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-694; *People v. Ledesma* (1987) 43 Cal.3d 171, 215.)  "If the record on appeal fails to show why [trial] counsel acted or failed to act in the instance asserted to be ineffective, unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation, the claim must be rejected on appeal." (*People v. Kraft* (2000) 23 Cal.4th 978, 1068-1069; *People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-268.)

---

[9]  In 2010, after the crimes at issue in the present case were committed, the Legislature "reorganize [d] without substantive change the provisions of the Penal Code relating to deadly weapons . . . ." (Legis. Counsel's Dig., Sen. Bill No. 1080, 10 Stats. 2010 (2009–2010 Reg. Sess.) Summary Dig., pp. 4137–4138.)  The new statutes became operative January 1, 2012.  All further references to former Penal Code sections are to provisions of the affected statutes as they read before the reorganization.

In the present case, the record does not disclose why appellant's trial counsel did not move to suppress his confession on the grounds appellant now urges on appeal, and it is not altogether clear whether there could have been a reasonable tactical explanation for his failure to do so. We need not reach this issue, however, if appellant fails to satisfy the second prong of the showing required of him, that is, that he was prejudiced by trial counsel's omission. Accordingly, we turn first to that question.

"In the context of a potential pretrial motion counsel has a duty to research the law, investigate the facts and make the motion in circumstances where a diligent and conscientious advocate would do so. [Citations.] This does not mean counsel has to be absolutely convinced the motion, if made, would be granted nor that the motion, if granted, would result inexorably in the defendant's acquittal. [Citations.] The motion need only be meritorious. [Citation.]" (*People v. Gonzalez* (1998) 64 Cal.App.4th 432, 437, fn. omitted (*Gonzalez*).)

"To establish prejudice, however, the defendant must do more than show the motion would have been meritorious. When the alleged deficiency is the failure to make a suppression motion, the defendant must show, in addition, the motion would have been *successful*. [Citation.]" (*Gonzalez*, *supra*, 64 Cal.App.4th at p. 438.) The issue now before us, then, is whether the record on this appeal affirmatively shows that a motion to suppress appellant's confession as the fruit of illegal arrest would have been *granted*. This, in turn, requires this court to consider whether the record shows that the arrest was in fact illegal.

The circumstances of appellant's arrest in February 2009 were as follows. As already noted, the arrest was not connected to Johnson's killing. It occurred when the police saw Toussaint open the front passenger door of appellant's mother's car, which appellant had parked at a liquor store, and lean in as if putting something down. Appellant, who was getting into the driver's side of the car at the time, made no objection to Toussaint's actions.

The police then observed a gun on the floor of the car in plain sight. In the words of the arresting officer, appellant was arrested for "allowing someone in his car to have a

8

gun." This description matches the offense defined by former section 12034, subdivision (a) (currently recodified as section 26100, subd. (a)), which provides: "It is a misdemeanor for a driver of any motor vehicle or the owner of any motor vehicle, whether or not the owner of the vehicle is occupying the vehicle, to knowingly permit any other person to carry into or bring into the vehicle a firearm in violation of" the statute prohibiting carrying a loaded firearm in a public place (i.e., former section 12031, subd. (a)(1), now recodified as section 25850, subd. (a)).

Appellant's argument on appeal is that the officers who arrested him and Toussaint did not have probable cause to believe that appellant *knowingly permitted* Toussaint to put the gun in appellant's mother's car. Appellant acknowledges that once the officers saw the gun, they may have had reasonable cause to *detain* appellant for further investigation. But, he argues, they could not *arrest* him, as they did, based on their suspicion that he had committed a misdemeanor they did not directly witness. (See §§ 836, subd. (a) [peace officers may make warrantless arrests only for felonies, or for non-felony offenses committed in officer's presence]; 836.5, subd. (a) [ordinances may permit public employees to make warrantless arrests, but only upon reasonable cause to believe arrestee has committed misdemeanor in employee's presence].)

We reject this argument, because we disagree with its premise, that is, that the officers did not actually *witness* appellant's commission of the misdemeanor. The arresting officers saw Toussaint lean down into appellant's mother's car as if placing something there, at the same time that they saw appellant getting into the car on the driver's side. One of the officers then observed the gun lying in plain sight in a location in which Toussaint could have placed it while he leaned into the car. While not conclusive evidence that appellant committed the misdemeanor for which he was arrested, this observation was sufficient to give the officers probable cause to believe not only that appellant had committed the crime, but also that they had witnessed him committing it. Thus, as far as appears from the record on appeal, the arrest was valid. Accordingly, we are not persuaded that appellant's trial counsel rendered ineffective

9

assistance by failing to move to suppress appellant's confession as the fruit of an illegal arrest.

### B. Jury Instructions on Accomplice Testimony

It is undisputed that Toussaint drove appellant to the gas station where appellant shot Johnson. Thus, if (but only if) Toussaint was aware in advance that appellant intended to commit a crime as to which Johnson's death was a reasonable and probable consequence, Toussaint potentially was guilty of aiding and abetting the homicide, and thus could have been found to be appellant's accomplice. (See *People v. Snyder* (2003) 112 Cal.App.4th 1200, 1220.)

Appellant contends there was evidence from which the jury could have found that Toussaint did know of appellant's intent, and thus there was evidence that Toussaint was appellant's accomplice. Because of this, appellant argues, the trial court erred in failing to instruct the jury that accomplice testimony must be corroborated and viewed with caution. Appellant also notes that the trial court did tell the jury: (1) that Toussaint's custody status did not in itself make him less believable, and (2) that the jury should not speculate as to whether Toussaint had been or would be prosecuted in connection with the shooting. Appellant argues that these two instructions encouraged the jury to judge Toussaint's credibility overly favorably. Appellant contends that the effect of giving these two instructions, combined with the *failure* to give an accomplice testimony instruction, was to deny appellant his due process right to a fair trial, by encouraging the jury to give undue credence to Toussaint's testimony.

As appellant acknowledges, however, to the extent there was evidence tending to show that Toussaint was his accomplice, that evidence necessarily also showed that appellant premeditated the murder. Thus, treating Toussaint as an accomplice would have been directly contrary to appellant's defense at trial, which was that he came upon Johnson by happenstance, and shot him only because he believed (albeit incorrectly) that Johnson was about to shoot him—in other words, that he acted in imperfect self-defense. Thus, had the trial court proposed to give an accomplice testimony instruction, appellant's trial counsel might well have objected.

10

Moreover, any error was harmless beyond a reasonable doubt. Toussaint's testimony was largely consistent with appellant's own version of the facts on the critical issues regarding appellant's mental state just before and during the shooting. Toussaint testified that he did not know Johnson was at the gas station until he and appellant pulled into the parking lot; that he did not have any advance knowledge that appellant would shoot Johnson; that appellant looked nervous and scared when he spotted Johnson at the gas station; and that Johnson's attitude as he approached Toussaint and appellant was hostile and threatening. In addition, Toussaint corroborated the testimony of O.M. and her brother that they had never known appellant to carry a gun or commit acts of violence.

It was in appellant's interest to have the jury believe these aspects of Toussaint's testimony. Indeed, in closing argument, the prosecutor urged the jury *not* to believe Toussaint on these points, whereas appellant's trial counsel argued that these aspects of Toussaint's testimony *should* be believed. Thus, giving an instruction that Toussaint's testimony required corroboration and should be viewed with caution would not have benefited appellant's case. If anything, the absence of such an instruction worked in appellant's favor. Accordingly, even if the trial court erred in its instructions regarding Toussaint's credibility, any error was harmless beyond a reasonable doubt.

## C. Failure to Instruct on Provocation and Second Degree Murder

The jury was instructed, using CALCRIM No. 570, on the concept of provocation as it pertains to voluntary manslaughter committed in the heat of passion. The jury was also instructed that if it found appellant acted with malice, but without premeditation and deliberation, it could convict him only of second degree murder. The prosecutor reiterated this in his closing arguments, telling the jury that "a decision to kill rashly, impulsively, and without careful consideration is not deliberate and premeditated," and that absent premeditation and deliberation, the jury could not find appellant guilty of first degree murder.

However, appellant's trial counsel did not request, and the trial court did not give, CALCRIM No. 522, which informs the jury that "[p]rovocation may reduce a murder

11

from first degree to second degree" if the jury finds that the provocation interfered with the defendant's ability to deliberate and premeditate. (See *People v. Thomas* (1945) 25 Cal.2d 880, 903.) Appellant contends that the trial judge should have given this instruction sua sponte, or alternatively, that his trial counsel's failure to request the instruction constituted ineffective assistance of counsel.

### 1. Obligation to Instruct Sua Sponte

The official bench notes to CALCRIM No. 522 characterize it as "a pinpoint instruction, to be given on request," citing *People v. Rogers* (2006) 39 Cal.4th 826, 877-878 (*Rogers*) as authority for that proposition. (Judicial Council of Cal. Crim. Jury Instns. (Fall 2013 ed. ) Bench Notes to CALCRIM No. 522, p. 294 (Bench Notes).) In *Rogers*, our Supreme Court squarely held that CALJIC No. 8.73, the equivalent of CALCRIM No. 522, is a pinpoint instruction, and that the trial court did not commit reversible error in that case by failing to give it sua sponte. (*Rogers*, *supra*, 39 Cal.4th at pp. 878-880.)

We are, of course, bound by the Supreme Court's holding, unless it is not on point or has been overruled. (*Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450, 455.) Appellant's briefs make no effort either to distinguish *Rogers*, *supra*, 39 Cal.4th 826, or to argue that it is no longer good law on the relevant point.[10] We therefore need not consider the issue further. Because CALCRIM No. 522 is a pinpoint instruction and appellant's trial counsel did not request it, the trial court did not err in failing to give it.

### 2. Trial Counsel's Failure to Request Instruction

In the alternative, appellant argues that his trial counsel rendered ineffective assistance by not requesting the instruction. He contends the jury might not have found premeditation and deliberation beyond a reasonable doubt if its attention had been drawn to the possibility that appellant's use of the gun was a spontaneous response to his perception that Johnson was "advancing on him and appear[ed] to be reaching for a gun."

---

[10] Indeed, appellant's opening brief does not even cite *Rogers*, although it does discuss other cases cited in the Bench Notes.

12

Respondent counters that such a request would not have been granted, because (1) there was insufficient evidence of provocation to support the instruction; (2) appellant's trial counsel made a reasonable tactical choice to focus on imperfect self-defense rather than provocation; and (3) the absence of the instruction did not prejudice appellant, because the jury was not likely to view the facts as involving provocation.

On direct appeal, we cannot second-guess trial counsel's decisions when the record does not preclude the possibility that those decisions were the product of a reasonable tactical choice. " 'In the usual case, where counsel's trial tactics or strategic reasons for challenged decisions do not appear on the record, we will not find ineffective assistance of counsel on appeal unless there could be no conceivable reason for counsel's acts or omissions. [Citations.]' [Citation.]"]. (*People v. Jones* (2003) 29 Cal.4th 1229, 1254.) "If the record on appeal fails to show why counsel acted or failed to act in the instance asserted to be ineffective, unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation, the claim must be rejected on appeal. [Citation.] [Wh]ere the record . . . hints at the existence of some tactical reason for counsel's decision . . . [, or a]t least, the record fails to eliminate that possibility[, the] defendant's claim must fail for purposes of [direct] appeal."].) (*People v. Kraft*, *supra*, 23 Cal.4th at pp. 1068-1069.)

Here, appellant's trial counsel did not argue any defense other than voluntary manslaughter based on imperfect self-defense. This may have been because, as respondent points out, there was far more evidence supporting an imperfect self-defense theory than a provocation theory. Accordingly, it appears probable, or at least possible, that trial counsel made a deliberate tactical choice to emphasize imperfect self-defense exclusively. It was a rational strategy to try to raise a reasonable doubt as to premeditation, thus precluding a first degree murder conviction, and to encourage the jury to find voluntary manslaughter, rather than second degree murder, as the logical alternative. Thus, on the current record, we cannot conclude that appellant's trial counsel rendered ineffective assistance by failing to request an instruction on provocation and second degree murder.

13

### D. Sufficiency of Evidence for First Degree Murder

Appellant acknowledges that the jury instructions on premeditation and deliberation[11] were proper, but contends no reasonable jury could have found this element of first degree murder was proven beyond a reasonable doubt. Appellant bases this contention primarily on the surveillance video of the shooting, which establishes that less than 20 seconds elapsed between the arrival of Toussaint's Buick in the gas station parking lot and the shooting of Johnson. Appellant contends there is no evidence that appellant premeditated killing Johnson before he saw him at the gas station, and that the 20-second interval is too short a time for premeditation.

In reviewing the sufficiency of the evidence in criminal appeals in general, we follow well-established principles. "We ' "review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." ' [Citations.] We presume ' "in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." [Citation.] This standard applies whether direct or circumstantial evidence is involved.' [Citation.]" (*People v. Prince* (2007) 40 Cal.4th 1179, 1251.)

When addressing the specific issue of the sufficiency of the evidence to support a finding of premeditation, we also apply the analysis first set forth by our Supreme Court in *People v. Anderson* (1968) 70 Cal.2d 15, 26-27, and interpreted by subsequent decisions such as *People v. Pride* (1992) 3 Cal.4th 195, 247; *People v. Mayfield* (1997) 14 Cal.4th 668, 768; and *People v. Bolin* (1998) 18 Cal.4th 297, 331-332. As explained in *People v. Anderson*, *supra*, 70 Cal.2d at pages 26-27, the principal categories of evidence that can support a finding of premeditation are: (1) facts about events prior to the killing that tend to show the defendant engaged in activities directed toward planning

---

[11] For brevity, our discussion of this issue refers to the premeditation and deliberation element of first degree murder simply as premeditation.

14

the killing; (2) facts about the defendant's prior relationship with the victim from which the jury could reasonably draw an inference of motive; and (3) facts about the nature of the killing from which the jury could reasonably infer that the defendant must have intended to kill the victim in a particular way. However, these three types of facts need not all be present; the list is not exclusive; and the sufficiency of the evidence to establish premeditation must be assessed in light of "the principle that '[t]he process of premeditation and deliberation does not require any extended period of time. "The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly. . . ." [Citations.]' [Citation.]" (*People v. Bolin*, *supra*, 18 Cal.4th at p. 332; accord, *People v. Lee* (2011) 51 Cal.4th 620, 636.)

In the present case, there was no direct evidence of advance planning, but there was evidence from which a jury could have drawn an inference that the shooting was planned. When appellant was asked why he was in that part of Oakland on the day of the shooting, despite his professed fear that he would be attacked or killed if he went there, he gave an explanation that, while innocent, was somewhat implausible. The prosecutor also argued that Toussaint had spotted Johnson at the gas station on his first pass-through (although Toussaint denied this), and pointed out that appellant testified the gun he used to kill Johnson was "rack[ed]" (that is, ready to fire) when he picked it up. This evidence was contested, but the jury was free to reject appellant's explanation and Toussaint's denial as not credible, and to infer from the circumstantial evidence that appellant went to Oakland in order to confront Johnson, and then, once he learned where Johnson was, armed himself before going to Johnson's location, with the intent of killing Johnson.

In any event, there was other evidence of the planning element of premeditation that was not controverted. As already noted, in arguing that the killing was premeditated, the prosecution relied mainly on the uncontroverted testimony of both Toussaint and appellant that when appellant spotted Johnson at the gas station, he told Toussaint to stop next to the Lexus. The jury could reasonably infer that when appellant gave this instruction, he had already formed the intent to kill Johnson, and wanted Toussaint to

15

position his car in a way that would facilitate this.  True, the interval between when appellant first spotted Johnson and when he began firing the gun was only a matter of seconds, but it is settled law that " '[t]he process of premeditation and deliberation does not require any extended period of time.' " (*People v. Bolin*, *supra*, 18 Cal.4th at p. 332.)

In addition, there was ample evidence of the second of the three *Anderson* factors, motive.  By appellant's own account, he and Johnson became embroiled in a hostile verbal confrontation as soon as they first met, and appellant was physically attacked on the same day by a group of men from Johnson's neighborhood.  Moreover, appellant believed Johnson had "put a hit out" on him, and had avoided going to Johnson's neighborhood for that reason, even though this meant he could not visit O.M. at her home.  The jury was certainly entitled to infer from this evidence that appellant had a motive to kill Johnson.

" ' "Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court[,] which must be convinced of the defendant's guilt beyond a reasonable doubt." ' " (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.)  " 'We do not reweigh evidence or reevaluate a witness's credibility.  [Citation.]'  [Citations.]" (*People v. Nelson* (2011) 51 Cal.4th 198, 210.)  Where the circumstances reasonably justify the trier of fact's findings, the reviewing court's opinion that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment.  (*People v. Stanley* (1995) 10 Cal.4th 764, 793.)  Given that standard, we are not persuaded that appellant's first degree murder conviction was not supported by substantial evidence.

## IV. DISPOSITION

The judgment is affirmed.

16

　　　　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　　　RUVOLO, P. J.

We concur:


_____
RIVERA, J.


_____
HUMES, J.