Filed 8/9/21  P. v. Dunger CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ANDREW JOSEPH DUNGER et al.,<br><br>    Defendants and Appellants. | B303947<br><br>(Los Angeles County<br>Super. Ct. No. TA145652) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Laura R. Walton, Judge.  Affirmed with corrections.

Caneel C. Fraser, under appointment by the Court of Appeal, for Defendant and Appellant Andrew Joseph Dunger.

Janet Uson, under appointment by the Court of Appeal, for Defendant and Appellant Carolina Gethsemane Rojas.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior

Assistant Attorney General, Zee Rodriguez, Supervising Deputy Attorney General, and Charles J. Sarosy, Deputy Attorney General, for Plaintiff and Respondent.

————————————

Andrew Joseph Dunger and Carolina Gethsemane Rojas got an axe and drove from Sacramento to Los Angeles to see a woman with whom Dunger once had a relationship. Dunger and Rojas used the axe on the woman and left her for dead. A jury convicted the two of premeditated attempted murder and aggravated mayhem. We affirm, except we direct the trial court to strike an enhancement on the mayhem count. Statutory references are to the Penal Code.

## I

We begin with the facts. The appellants are Dunger and Rojas. Their victim was Stephanie Corral. We recount what happened according to each person.

## A

Corral was the first witness. She testified she met Dunger in 2008. Corral married Dunger's uncle in 2012; this couple separated in 2015. Corral and her children then moved into Dunger's home with his family.

Before moving in, Corral began communicating with Dunger through video chat and Snapchat. At this time, Corral was beginning a separation with her husband. Dunger too was facing family issues. Corral testified, "We leaned on each other for support because we felt like we didn't have that."

At the time, Corral was 23. Dunger was 16.

Dunger and Corral smoked marijuana together. Dunger sometimes got the marijuana by taking it from where his parents kept theirs. Other times Corral brought it.

Their text messages grew sexual, intimate, and explicit. Corral told Dunger she was "a stay-at-home mom, and it got lonely." Dunger complained his parents were strict and overbearing.

Corral maintained she never had sexual intercourse with Dunger—a claim Dunger disputed at trial.

Corral ended the relationship after two months "by telling him that I couldn't do it anymore because I felt bad."

Corral "heard that there was an investigation" and told police she was sexting Dunger. Corral pleaded guilty to a misdemeanor for an inappropriate relationship with a minor. She served 110 days in jail and received three years' probation. A three-year protective order barring contact with Dunger took effect in 2016.

Corral testified she did not communicate with Dunger or his family for the next 18 or 24 months.

Then in March 2018 Corral got a Snapchat message from Dunger's account. The message said he needed to see her for closure. Corral blocked the account and did not respond.

Four or five days later, she received another Snapchat message, this time from an account containing Dunger's first name. He begged to see her right away; he had "found God" and needed to talk. Corral worried something was wrong. Although the restraining order remained in effect, she invited Dunger—who lived in Sacramento—to her home in Los Angeles.

Corral shared a home with her sister. Dunger wanted to talk privately somewhere. He did not have identification, so she agreed to get him a motel room. He gave her money for the room.

Dunger said he would drive down that night, alone, and he would bring marijuana. He arrived at Corral's house in a white

Dodge Durango after midnight on March 21, 2018. Corral got into the front passenger seat with her purse and a pink backpack. She saw the car was "pretty messy," with clothes and junk everywhere.

Dunger drove to the Central Inn Motel, which was about 10 minutes away. They arrived around 12:45 a.m.

Corral asked the motel clerk for a smoking room and learned these rooms were upstairs. Dunger's response was, "No, not upstairs. I don't want to have to run." Corral got a room downstairs.

Corral went to the room while Dunger moved the car. She heard a knock on the door a few minutes later and let Dunger in. He put his backpack on the little chair in the room.

There was another knock a few minutes later. Corral was not expecting anyone and had no idea who it could be. As she went to answer the door, she noticed Dunger was getting pepper spray out of his backpack. She asked him what it was for.

Dunger smirked.

Corral opened the door to find Rojas, whom Corral did not know.

Rojas told Corral, "You're gonna die tonight, bitch."

Dunger pepper-sprayed Corral in the eyes. Corral tried to escape but Dunger and Rojas got her back in the room.

Corral cried for help. "I was being loud, so [Rojas] was trying to cover my mouth, so I bit her finger. . . . I bite her finger for awhile, and then she tells Andrew to get the axe."

Dunger got a nine to 10-inch axe from his backpack. The witnesses referred to it as both an axe and a hatchet. It was an exhibit at trial.

Rojas told Dunger to hit Corral's head with the axe. Using the blunt end, he did. Corral let Rojas's finger go, ran for the door, and briefly got out of the room.

Rojas and Dunger grabbed her arms and pulled her back. They chased her around the room and used the axe on her.

Rojas and Dunger took turns swinging the axe. Corral tried to block the blows. Rojas said something like, "this is for his brother."

Using the bladed side, Rojas hit Corral's head. Corral was not sure how many times, but it was more than three. Dunger also hit Corral's head with the blade. "They took turns."

"There was a point where she pushed me onto the bed and put her knees over my hands and put her thumbs into my eyes and said, 'You thought you were gonna fuck him, didn't you?' " Rojas gouged Corral's eyes "really hard."

Corral screamed for help.

Dunger and Rojas pinned Corral down. One of them put the blade against the bottom of Corral's nose and cut upwards. "They took the axe and—and cut my nose off, kind of, in a way." "It partially took my nose off away from my face, up." Corral could not say who pinned and who sliced.

Rojas dragged Corral into the bathroom and sat on her chest. She choked Corral and said, "Why don't you just die already." Dunger said, "If you survive this, I'm going after your kids and your husband."

While Corral was in the bathroom, she heard a knock at the door. Dunger told the person at the door that they were "having rough sex."

Corral played dead. Dunger and Rojas threw "towels or something" over her and left.

Motel clerk Sujal Padhiyar also testified. He heard loud screaming from Corral's room and knocked on the door. No one answered. There was more screaming. Another clerk joined him. Padhiyar got the motel's housekeeper so she could open the door. At some point, the screaming stopped.

Two people left the room. One wore a sheet. The other was a male. They ran to the white Durango. As they sped off and hit another car, Padhiyar got their license plate number.

Julie Mercado testified she was the motel housekeeper. She was cleaning and heard loud screaming and banging. The screaming was intermittent; then it stopped. Mercado found Corral on the bathroom floor under sheets and a blanket. Corral was bleeding badly and could say only her name.

The jury saw security camera footage showing the white Durango arrive and Corral check in. Dunger then got out of the Durango and took his backpack into the room. A woman left the car about a minute later. About seven minutes after Corral checked in, Padhiyar went to the motel room door to investigate. Dunger and a person wearing a sheet left the room. Corral, Rojas, and Dunger were in the room for less than 22 minutes.

Paramedics took Corral to the hospital. She "was bleeding to death," so staff put her in the gravest trauma tier.

Emergency medical technician Isaac Rodriguez helped stabilize Corral that night. Rodriguez testified that, while waiting for the operating room, Corral asked him whether she would live. He sensed she thought she was dying. Corral told him what happened, and Rodriguez typed on his phone. His notes became an exhibit:

> *Andrew Dungbar reached out to patient via Snapchat Tuesday night according to patient. He asked if he could*

*see her the same evening. He asked her to get a room for him and her and insisted that it be on the 1st floor. She thought it was an odd request to insist for a room on the 1st floor. She got a room there anyway. While with him in the room someone banged on the door. A woman barged in. That's when patient was assaulted by ex boyfriend and exboyfriends current girlfriend with an ax. As they were assaulting her patient states ex and his girlfriend stated that they would kill her and her kids if she went to the police.*

Rodriguez also testified Corral said some things that were not in his notes. She said the male attacker had a restraining order against her. Rodriguez was about 80 percent sure Corral said the restraining order was because they had had sex. Corral also said she did not listen to her gut when he insisted on a first-floor room.

By 5:30 that evening, detectives found the Durango at Rojas's Sacramento house. A detective saw Dunger and Rojas unloading the Durango and arrested them. The detective found a bloody axe under a car in Rojas's driveway. Another detective found a pillow and a hooded sweatshirt in a trash can. Both were bloody. The sweatshirt was dripping.

The detectives found blood-stained clothing in the house. The shower had been used recently.

Police found blood spots in the Durango, as well as a wallet with Corral's identification; a purse; shoes with blood; pepper spray; a roll of duct tape with blood on it; a package of zip ties; marijuana paraphernalia; and an open case of beer.

Corral and an emergency nurse described Corral's injuries to the jury. The jury saw many pictures.

7

Corral's little finger had been almost completely severed. Her brain was bleeding, and she had lacerations on her nose, head, left wrist, and right hand. Doctors put more than 40 staples in her head and stitches in her lip, jawline, forehead, and hands. Doctors glued and stitched her nose. The nurse testified Corral's hand and wrist cuts were defensive wounds.

Corral was in two hospitals for two to three weeks. She wore two hand casts for months. As of trial, the range on Corral's left hand was limited. The pain in her hands made her give up driving. She needed help for household tasks and to lift objects like a pot. Her little finger was disfigured. She was facing more surgeries.

### B

Rojas did not testify or call witnesses. The prosecution presented testimony that, after her arrest and while at the Sacramento police station, Rojas spontaneously asked a detective if there was any way to prove she had been to Los Angeles. She claimed she had not been there.

### C

Dunger testified he met Corral when he was nine or 10 years old. She moved into his home near Sacramento when he was 15 and she was in her 20s.

Corral gave Dunger a cellphone and began a sexting relationship with him when he was 15. She would send him naked pictures and sexual messages. They started having sex. They had sex nearly every day. According to Dunger, "Me and her would hang out pretty much 24/7. . . . [S]he was, basically, like my escape from being at home."

Dunger got into trouble a lot. His father and stepmother would lock him in his room and keep him from his siblings. They allowed contact with Corral.

Corral gave Dunger marijuana, alcohol, pain pills, and acid. She would drink and smoke marijuana with Dunger's younger siblings too.

Dunger's parents kicked Corral out when they found his phone and saw videos and pictures of the two having sex. Dunger's relationship with Corral ended around this time. This was about a month before Corral went to jail. Dunger was 17.

The day she got out of jail, Corral sent Dunger a Snapchat message asking him to meet her. He did, and they smoked. Corral asked him about his sex life and offered oral sex. Dunger declined; he was done with the relationship. He had no further contact with Corral until March 2018.

In the meantime, Dunger met Rojas and began dating her. He soon moved into Rojas's home. They bought, sold, and used a lot of drugs together.

In March 2018, Dunger and Rojas were looking for acid, but their source was unavailable. Dunger had Rojas contact Corral using his Snapchat account; he remembered she had a local dealer. Dunger assured Corral it was okay to talk to his girlfriend. Corral said she would reach out to her contact but then she did not respond for two weeks.

Dunger messaged Corral again, and she told him she had acid to sell. They planned to meet at Corral's house in Los Angeles. She could supply the acid and would try to get Xanax from a friend.

Dunger had some notion Rojas was a jealous girlfriend but was not worried about her meeting Corral.

9

Dunger and Rojas left Sacramento later that afternoon and arrived at Corral's house after midnight. Corral got in the car, greeted Dunger, and said "What's up?" to Rojas, who was lying down in the backseat.

Dunger drove to a gas station, and Corral bought beer. Dunger was only 19; he gave Corral the beer money.

They went to the motel to wait for the Xanax dealer. Dunger denied saying anything about wanting a first-floor room or not wanting to run.

Corral and Dunger entered the motel room, talked, and smoked marijuana. Dunger had had beer before leaving for Los Angeles, had smoked marijuana on the drive down, and drank more beer on the way to the motel.

After a couple minutes in the motel room, Rojas knocked, and Corral let her in. Rojas went to the bathroom because she was feeling sick. When she came out, the three of them sat on the bed and smoked marijuana while waiting for the Xanax to arrive.

Corral leaned over and asked Dunger if he would let her kiss him. Dunger and Corral looked at Rojas, who started yelling. Dunger described the advent of the violence in these words: "Then they started—Carolina started yelling. Stephanie started yelling. They started, like, having an argument. But it was more like—they were screaming at each other, and then they started fighting. . . . Yeah, it was physical. I—I don't know directly punching or—but they were both putting hands on each other."

Dunger watched in shock. He grabbed pepper spray and "sprayed the shit out of both of them." It had no effect.

10

Then Rojas pulled out an axe. Dunger did not bring it into the room. He and Rojas had taken the axe from Rojas's home for protection: they had about $1,600 for the drugs and Dunger feared the dealer might rob them.

Rojas hit Corral with the axe for "like a couple seconds, like maybe, like, five seconds." Dunger testified Rojas's motions were like tapping a nail into drywall; they were rapid, short hits, not intense ones.

Corral grabbed the axe while Rojas was holding it. Dunger wrested it from them both and threw it. No one used the axe again.

Rojas and Corral wrestled on the floor while Dunger tried to pull them apart. When Rojas got on top of Corral and strangled her, Dunger ran over to pull Rojas off.

Dunger heard banging on the door. He opened it and saw two men. One said he was calling 911.

Dunger saw Corral lying in blood. He was shocked and scared the police would think there was a robbery.

Dunger left, with Rojas trailing him in a sheet. They drove back to Sacramento, where police arrested them at Rojas's house.

Dunger denied threatening to kill Corral. He denied hitting her or injuring her in any way.

Both the prosecutor and Rojas's attorney cross-examined Dunger. The prosecutor began by showing Dunger a picture of Corral's injuries:

*Q. Placing 18—People's 18 in the screen in front of you, Mr. Dunger. Can you see it on your screen?*

*A. Yes. Yes, I see it.*

*Q. Using my pen, pointing to some injuries along the jaw line. Do you see those injuries?*

*A. Yes.*

*Q. How did they get there?*

*A. I'm not sure.*

*Q. Do you see the injuries on her forehead?*

*A. Yes.*

*Q. How did they get there?*

*A. I'm not sure.*

*Q. Do you see the injuries to the side of her ear?*

*A. I do.*

*Q. How did they get there?*

*A. I'm not sure.*

## D

The prosecution charged Dunger and Rojas with two counts: premeditated attempted murder (§§ 664, 187, subd. (a)) and aggravated mayhem (§ 205). For both counts, the information alleged both defendants personally inflicted great bodily injury (§ 12022.7, subd. (a)) and personally used a deadly weapon—an axe (§ 12022, subd. (b)(2)). The trial court later amended the deadly weapon allegation to refer to section 12022, subdivision (b)(1).

Trial began on October 28, 2019, and lasted about a week. The jury convicted both defendants on both counts. The jury also found true both allegations on the first count and the deadly weapon allegation on the second count.

The trial court sentenced each defendant to life in prison plus four years, with a mandatory minimum of seven years. The sentence for count 1 included three years for the great bodily injury enhancement and one year for the deadly weapon enhancement. The court stayed the sentences on count 2 under section 654.

## II

We now discuss Dunger's and Rojas's appellate arguments.

## A

Dunger and Rojas argue the trial court should have allowed their lawyers to inquire about whether Corral had had a sexual relationship with Dunger's younger brother. They claim the court erroneously prevented them from undermining Corral in a case that hinged on credibility, thereby violating their constitutional rights. Rojas additionally claims the evidence was relevant to her state of mind and a heat of passion defense, which she admits she did not raise at trial.

The trial court's ruling was proper. It did not violate defendants' constitutional rights.

Before trial, the prosecution moved to exclude mention of a relationship between Corral and Dunger's younger brother, arguing it was irrelevant and would confuse and mislead the jury. Dunger's counsel opposed the motion, arguing the evidence would show moral turpitude and was relevant to Corral's veracity. The court deemed the issue irrelevant "right now" but asked counsel to raise it at trial if and when counsel believed it became relevant.

Corral mentioned the brother once in her testimony. She noted Rojas, while attacking, made a comment along the lines of, "this is for his brother."

The prosecution renewed its objection after its examination. Dunger's attorney proffered Dunger's younger brother and Corral had had a sexual relationship "a while ago" when the brother was 14, which constituted moral turpitude. The attorney referred to a statement made by the brother but did not offer it to the trial court. Rojas's attorney argued the

13

evidence could be relevant to heat of passion or self-defense and thus to an attempted manslaughter instruction.

The trial court ruled there could be no heat of passion if the relationship was "a while ago."

The court asked if there were any charges, investigation, or arrest relating to the brother. No one knew of any. The court concluded a mere allegation of child molestation did not amount to a crime of moral turpitude. The court precluded the defense from raising the issue with Corral "at this time." But the court recognized, "if your clients take the stand and want to say this is the reason we did it, then that's another issue."

Neither defense lawyer returned to the subject.

We uphold a correct ruling on appeal, even if the reason given is wrong. (*People v. Smithey* (1999) 20 Cal.4th 936, 972.)

A party may impeach a witness regarding past conduct involving moral turpitude, even absent a conviction, but trial courts have wide discretion about whether to admit such evidence. (*People v. Clark* (2011) 52 Cal.4th 856, 931–933.) This discretion does not implicate confrontation rights unless the defendant shows excluded testimony would have produced a significantly different impression of the witness's credibility. (*People v. Pearson* (2013) 56 Cal.4th 393, 455–456.) Excluding impeachment evidence on collateral matters that are only slightly probative of a witness's veracity does not infringe a defendant's constitutional rights. (*People v. Jennings* (1991) 53 Cal.3d 334, 372; see also *People v. Fudge* (1994) 7 Cal.4th 1075, 1103 [excluding defense evidence on a minor or subsidiary point does not impair an accused's right to present a defense].)

Assuming Corral had a past relationship with Dunger's younger brother and assuming this constituted moral turpitude,

14

the trial court retained discretion to exclude the topic. The issue was not relevant to the merits of the case. Neither defendant said or proffered this was the reason for the attack. Dunger's attorney conceded the alleged conduct was remote. The court did not abuse its discretion.

Dunger and Rojas also fail to establish a reasonable probability this cross-examination would have changed the jury's impression of Corral's credibility. At trial, Dunger attacked Corral as a person of moral turpitude when he testified she had had daily sex with him when he was a minor and had supplied him and his younger siblings with drugs and alcohol when they all were minors. Corral herself volunteered she went to jail for having an inappropriate relationship with Dunger, who then was underaged. Dunger's counsel mounted the same attack when he questioned both Corral and emergency medical technician Rodriguez about Corral's past relationship with Dunger and when he showed the jury one of Corral's sexually explicit messages to Dunger. Further, apart from the issue regarding Dunger's brother, defense counsel had nearly free rein when cross-examining Corral.

Dunger, for his part, incorrectly maintains his guilt hinged entirely on Corral's testimony, and knowing she had had sex with another underaged person would have tipped the scales in his favor. This argument overlooks the fact that, apart from Corral's testimony, the testimony of independent witnesses, video surveillance, and the physical evidence supported the prosecution's case and undermined Dunger's testimony. Dunger's account was weak because he could not account for the range of injuries Corral indisputably suffered. His claim that Rojas surprised him by producing the axe and extensively cutting

15

Corral in five seconds was implausible. His story he and Rojas brought $1,600 to buy drugs suffered from the lack of corroborating evidence: apart from the modest motel payment, there seemed to be no money and no drugs found at the scene or anywhere else. To objective observers, Dunger's testimony seems more like convenient invention than a plausible version of the truth.

Rojas, for her part, makes an attack on the court's ruling that is strange, because her trial strategy was to *agree* with Corral's testimony, not to undermine it. In the contest between Corral and Dunger, Rojas logically favored Corral, because Dunger's version exculpated Dunger by entirely blaming Rojas. Further, Rojas concedes she did not present a heat of passion defense at trial. Precluding counsel from cross-examining Corral about a possible remote sexual relationship with Dunger's brother did nothing to hamper Rojas's presentation of this defense or to harm her cause.

We reject the claim that the requested inquiry would have cast Corral's credibility in a significantly different light. This objection to the verdict fails.

Because evidence of a past relationship between Corral and Dunger's brother could not have changed the trial result, we further reject Rojas's contention her trial lawyer was ineffective for failing to return to this subject after Dunger testified.

B

Defendants next contend the trial court committed reversible error by failing to instruct the jury on attempted voluntary manslaughter based on heat of passion or sudden quarrel. There was no duty to give this instruction in this case, and any failure to give the instruction was harmless.

16

Trial courts must instruct on lesser included offenses that are supported by substantial evidence, even absent a defense request. (*People v. Breverman* (1998) 19 Cal.4th 142, 162.) We independently review a trial court's failure to instruct the jury on an issue of law. (*People v. Millbrook* (2014) 222 Cal.App.4th 1122, 1137 (*Millbrook*).)

When a defendant seeks to kill but acts upon a sudden quarrel or in the heat of passion, attempted murder becomes attempted voluntary manslaughter, which is a lesser included offense. (*Millbrook, supra*, 222 Cal.App.4th at p. 1137.) Under a heat of passion or sudden quarrel theory, the defendant must have attempted to kill while under the influence of extreme emotion and must have been provoked by conduct that would cause an ordinary person of average disposition to act rashly and without due deliberation. (See *id.* at pp. 1137, 1139, 1140.)

Only Rojas's lawyer requested a manslaughter instruction. He did so before the defense case—that is, before there was evidence to support it. The court ruled there was insufficient evidence and denied the request. Rojas's lawyer did not renew his request after Dunger testified.

We need not determine whether the standard for harmless error here is from *People v. Watson* (1956) 46 Cal.2d 818, 836 or from *Chapman v. California* (1967) 386 U.S. 18, 24, because any error here was harmless no matter the standard. Beyond a reasonable doubt, the asserted error did not contribute to the verdict. (See *People v. Beltran* (2013) 56 Cal.4th 935, 956 (*Beltran*).)

We analyze the matter first as to Dunger and then as to Rojas.

17

As to Dunger, no evidence suggested he acted in the heat of passion or because of a sudden quarrel. By Corral's account, she did not provoke Dunger on the night of the attack. By Dunger's account, he never attacked Corral at all; Rojas was the sole assailant and Dunger was an innocent bystander. (See *People v. Gutierrez* (2003) 112 Cal.App.4th 704, 709; see also *People v. Sinclair* (1998) 64 Cal.App.4th 1012, 1016, 1020 [defendant not entitled to voluntary manslaughter instruction where he denied shooting the victim and further denied he was armed].) Dunger and Corral did have a sexual history, but that was from years before. (See *Beltran*, *supra*, 56 Cal.4th at p. 951 [no voluntary manslaughter once passing time cools passion].) Dunger thus was not entitled to a heat of passion instruction, and failure to give it could not have contributed to his convictions, beyond a reasonable doubt.

As to Rojas, Dunger provided the only evidence Corral supposedly provoked Rojas that night. But a request for permission to kiss would not induce a reasonable person "to react from passion and not from judgment." (*Beltran*, *supra*, 56 Cal.4th at p. 939.) Apart from saying there was "yelling," Dunger did not describe any supposedly provocative words Corral uttered. This account did not support a duty to give a heat of passion instruction. Neither could there have been prejudice to Rojas. The evidence of provocation—Corral's supposed request for a kiss and the ensuing fight—"was both weak and contradicted." (*Beltran*, *supra*, 56 Cal.4th at p. 956.) More generally, Dunger's account of the violence made no sense, for his description of Rojas's "five seconds" with the axe could not account for the Corral's extensive injuries, which were indisputable. When cross-examined about how Corral came to

18

suffer injuries to her jawline, her forehead, and her ear, Dunger was reduced to repeating, "I'm not sure." Refusing to instruct the jury on attempted voluntary manslaughter was harmless.

For the same reason, failing to renew the request for this instruction after Dunger testified was not ineffective assistance of counsel requiring reversal. (See *Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*) [defendant must show prejudice to establish ineffective assistance].)

A further ground is an alternative basis for rejecting defendants' argument about the heat of passion instruction. In addition to finding both defendants guilty of attempted murder, the jury found true the allegation that their attempt "was committed willfully, deliberately and with premeditation." This finding rules out the possibility of finding the defendants acted upon a sudden quarrel or in the heat of passion. (See *Millbrook*, *supra*, 222 Cal.App.4th at p. 1138; see also *People v. Peau* (2015) 236 Cal.App.4th 823, 830–832 [any failure to give heat of passion instruction was harmless where the jury convicted the defendant of first degree murder and thereby found the murder was willful, deliberate, and premeditated].) In proving the premeditation allegation beyond a reasonable doubt, the prosecution negated a provocation theory beyond a reasonable doubt.

## C

Rojas argues her retained trial counsel was ineffective in unreasonably presenting a "nondefense" that conceded guilt and ran contrary to the law while abandoning crucial defenses supported by the evidence. She claims this strategy shows counsel failed to investigate and prepare the case adequately.

To establish ineffectiveness, a defendant must show counsel's efforts fell below an objective standard of

19

reasonableness and the deficient performance prejudiced the defendant.  (*Strickland*, *supra*, 466 U.S. at pp. 687–688.)  In reviewing ineffective assistance claims, we defer to counsel's reasonable tactical decisions and presume counsel acted within the wide range of reasonable professional assistance.  (*People v. Mai* (2013) 57 Cal.4th 986, 1009 (*Mai*).)

Claims of ineffective assistance usually are more appropriately raised in habeas corpus proceedings. (*Mai*, *supra*, 57 Cal.4th at p. 1009.)  On direct appeal, we reverse a conviction only if (1) the record shows counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) no satisfactory explanation could exist.  (*Ibid.*)

The background to Rojas's argument is as follows.  Shortly before trial, her retained attorney told the court he had an upcoming trial in federal court and was not ready for Rojas's trial.  Then he reversed field and said he *was* ready.  He said this case was straightforward and he was willing to stipulate to most of it; the main issue was Rojas's inability to have both an intent to kill and an intent to disfigure permanently.

At the sentencing hearing, counsel explained his trial strategy:  to show his client was willing to accept responsibility and would be worthy of parole.  Counsel noted Rojas had tried to plead guilty for a sentence of 14 years to life on the attempted murder count.  The prosecution, however, insisted on a package deal:  it refused Rojas's offer because Dunger would not change his plea.

Following this strategy, Rojas's attorney made a brief opening statement at trial.  Among other things, he told the jury most of what they just heard from the prosecutor was true.  And

20

he said the evidence would show an intent to kill but not an intent to maim.

Rojas's attorney did not cross-examine most of the prosecution witnesses. He did cross-examine Corral, and his questioning bolstered his defense theory. He also extensively cross-examined Dunger.

Rojas's attorney maintained his chosen strategy in closing argument. He argued Corral told the truth, both Rojas and Dunger tried to kill her, and the prosecution proved intent to kill beyond a reasonable doubt. Then he argued Rojas could not have had the intent to disfigure permanently; the facts of this case showed this was illogical, as the intent to kill was so clear and the two intents were "diametrically opposed." He argued the government overreached in bringing a mayhem count it could not prove.

Rojas's counsel's explanation of his tactical thinking was not irrational. Under *Mai*, *supra*, 57 Cal.4th 986, this means we leave the ineffective assistance issue to the customary forum of a habeas corpus proceeding. (See also *McCoy v. Louisiana* (2018) __ U.S. __, __ [138 S.Ct. 1500, 1505, 1507–1509] [defendants have the right to insist counsel refrain from admitting guilt, even when counsel's experienced view is confessing guilt offers defendants the best chance].)

D

Rojas argues we must reverse her conviction because Dunger disclaimed responsibility and incriminated her, and the trial court failed to instruct that accomplice testimony requires corroboration and should be viewed with distrust.

The trial court gave no accomplice instructions, perhaps because the parties went over instructions before Dunger testified.

Trial courts should give a cautionary instruction when an accomplice's testimony incriminates a defendant. (*People v. Guiuan* (1998) 18 Cal.4th 558, 569.) However, failure to give accomplice instructions is not prejudicial where, independent of the witness's testimony, corroborating evidence connected the defendant to the offense. (*People v. Snyder* (2003) 112 Cal.App.4th 1200, 1221–1222.)

There was no prejudice here. Corral's testimony and the video evidence powerfully implicated Rojas in the attack, as did Rojas's flight to Sacramento. (See *People v. Zapien* (1993) 4 Cal.4th 929, 983 [flight implies consciousness of guilt].) Dunger's testimony was nearly superfluous.

The trial court instructed the jurors to use their common sense in judging witness credibility. It likewise instructed them to consider whether a personal interest influenced any witness's testimony and whether other evidence proved or disproved any fact about which the witness testified. It is common sense that an accused has a motive to lie and an interest in shifting the blame to a codefendant. Rojas's attorney underscored this by arguing Dunger was a liar.

Because it is not reasonably probable Rojas would have achieved a more favorable result with an accomplice instruction, failing to request one was not ineffective assistance of counsel requiring reversal.

E

Dunger and Rojas identify another instructional error: they claim the trial court violated their constitutional rights to a

22

unanimous verdict by failing to give a unanimity instruction for the aggravated mayhem count. They say the prosecution presented multiple acts as the basis for this count, and the court should have required the jurors to agree on the specific acts giving rise to their guilty votes.

We independently review claims of instructional error. (*People v. Hernandez* (2013) 217 Cal.App.4th 559, 568 (*Hernandez*).)

Aggravated mayhem is when a person either (a) intentionally and permanently disables or disfigures another, or (b) intentionally deprives another of a limb, organ, or body part, and shows extreme indifference to the physical or psychological well-being of the victim. (§ 205.)

In closing argument, the prosecutor told the jury it could find aggravated mayhem based on either the injury to Corral's nose or to her little finger. He argued the defendants jointly tried to remove Corral's nose. He acknowledged Corral was acting defensively in raising her hands but argued the intent to disable was still there for the finger, as the defendants kept swinging after blood spilled in order "to take that defensive limb away."

When the evidence suggests more than one discrete crime and the prosecution fails to elect among them, the trial court must require the jury to agree on the same criminal act. (*People v. Russo* (2001) 25 Cal.4th 1124, 1132.) This way, the jury does not amalgamate evidence of multiple offenses, none of which the prosecution has proved beyond a reasonable doubt, to convict on the theory the defendant must have done something worthy of conviction. (*Ibid.*) A unanimity instruction thwarts the possibility of jurors convicting based on different conduct.

23

(*Hernandez*, *supra*, 217 Cal.App.4th at p. 569.)  The trial court's duty to instruct exists even absent a defense request.  (*Ibid*.)

A unanimity instruction is not required, however, when the acts alleged form one course of criminal conduct, or when the defendant offers essentially the same defense to each act.  (*People v. Jennings* (2010) 50 Cal.4th 616, 679–680; *Hernandez*, *supra*, 217 Cal.App.4th at p. 572.)

This case involves a continuous course of criminal conduct. It was brief, nonstop, and confined to the area within a small motel room.  No unanimity instruction was necessary.  (See *People v. Napoles* (2002) 104 Cal.App.4th 108, 115–116 [with the continuous-course-of-conduct exception, "no unanimity instruction is required because the multiple acts constitute a single criminal event"].)

F

Dunger and Rojas contend we must reverse their convictions due to prosecutorial misconduct during closing and rebuttal argument.  They say the challenged remarks fall into two categories:  arguing facts outside the evidence and using improper and inflammatory rhetoric to appeal to jurors' emotions. With one exception discussed below, defendants failed to assert timely and specific objections to the challenged remarks.  They have forfeited these arguments on appeal.  (See *People v. Ramirez* (2019) 40 Cal.App.5th 305, 310.)  Defendants alternatively argue failing to object amounted to ineffective representation warranting reversal.  We reject these arguments.

We begin by summarizing our analysis.  Most of the remarks are unobjectionable; for the remainder, it is not reasonably probable defendants would have obtained a more favorable result had trial counsel objected.  (See *Mai*, *supra*, 57

24

Cal.4th at p. 1009.)  Nor was there a danger of jurors misunderstanding or misapplying the challenged remarks.  (See *People v. Seumanu* (2015) 61 Cal.4th 1293, 1337 (*Seumanu*) [defendant must show a reasonable likelihood the jury misunderstood or misapplied the challenged comments to prevail on a claim for prosecutorial misconduct].)

We turn to the prosecutor's remarks.

*Mom strength*.  Defendants claim the prosecutor committed misconduct because the prosecution did not produce an expert to testify how adrenaline affected Corral, yet argued Corral survived the axe attack due to adrenaline and "mom strength."

These comments fell within the permissible bounds of rebuttal to the defense argument.  They drew on common experience.  (See *People v. Cunningham* (2001) 25 Cal.4th 926, 1026 (*Cunningham*).)  The prosecutor was responding to defense arguments Corral should have suffered a cracked skull if Dunger really attacked her with an axe.  He explained people respond differently to traumatic events and gave an example of a mother lifting a car off her child.  He argued Corral survived this attack because she fought back.  The evidence supported this account. The prosecutor's comments were proper.

*Cracked rib.*  Defendants complain the prosecutor mentioned Corral had a "tenth cracked rib" from Rojas sitting on her.  They say this comment was improper, as there was no evidence to support it.  (See *Cunningham*, *supra*, 25 Cal.4th at p. 1026 [misconduct to refer in argument to matters outside the record].)

This passing comment was harmless.  "In general, we will not find brief, passing comments by the prosecutor to be prejudicial." (*People v. Ghobrial* (2018) 5 Cal.5th 250, 289.)  The

prosecutor went on to describe the many injuries Corral suffered that were supported by the evidence, including pictures and the testimony of multiple witnesses. Then he summarized: "We have staples. We have sutures. We have wrists. We have exposed bone. We have the nose cut off. We have the partially amputated finger." The prosecutor's reference to a broken rib was not prejudicial.

*Corral's backpack*. Defendants argue the prosecutor erroneously implied police found Corral's bag in the Durango. This one comment could not have affected the trial outcome, as no one disputed the police found Corral's identification in the car. Further, during deliberations, the jury asked whether Corral's pink backpack was found. The court answered: "There is no evidence that Stephanie's pink backpack was found." The prosecutor's comment about the bag was harmless.

*Nail marks.* Defendants claim it was improper for the prosecutor to suggest nail marks on Corral's face proved she told the truth about Rojas gouging her eyes. The prosecutor made this comment after Dunger's lawyer had argued there was no evidence of eye injury and Corral's story lacked support. The prosecutor pointed to an exhibit—a picture of Corral's injured face—and invited the jurors to see the marks he saw around her eyes, which supported Corral's story.

This invitation was proper. The jurors could see for themselves if the marks existed and could draw their own conclusions about what the evidence showed. It is not misconduct to suggest jurors should examine evidence closely and to urge inferences from this inspection.

*Maim kit*. In response to the defense theory that Dunger and Rojas met with Corral simply to buy drugs, the prosecutor

gave the jury a hypothetical of two people going to a grocery store and buying an axe, duct tape, zip ties, and pepper spray—all of which were found in or near the Durango the day of the attack. The prosecutor told the jury, "You are the grocery store clerk. Does it sound like they're gonna have a spring break party? No. That is a kit to maim, to injure and to kill." Defendants argue the prosecutor improperly suggested they purchased the items simultaneously and imputed a level of planning and intent that was unsupported by the evidence.

These comments fell within the permissible bounds of rebuttal to the defense argument. Prosecutors have wide latitude to argue reasonable inferences from the evidence. (*Seumanu*, *supra*, 61 Cal.4th at p. 1331.) Through this hypothetical, this prosecutor argued a reasonable inference: bringing these supplies with them showed defendants intended to hurt and to kill.

*Chopped up.* Defendants complain the prosecutor roused the jury's passions and made the case seem worse than it was by arguing Corral had been "chopped up" with an axe. This was not misconduct. It was a fair description and inference from the evidence. (See *Seumanu*, *supra*, 61 Cal.4th at p. 1342.)

*Mafia reference.* Defendants say it was misconduct for the prosecutor to invoke mafia imagery. The prosecutor told the jury about reading a book by a "mafia hit man" who made an execution personal by foregoing a gun in favor of a special rope to choke "one of their own." Then the prosecutor said, "Members of the jury, if you want to kill someone personally and make them feel it, what are you gonna use? You will use a sharp axe. You will take it to their head. You are gonna make sure they feel every blow, every slice."

The prosecutor did not argue this case involved the mafia or some other gang.

Prosecutors may use illustrations drawn from common experience, history, or literature. (*Cunningham*, *supra*, 25 Cal.4th at p. 1026.) This illustration was tied to the personal nature of the attack on Corral, which was entirely at close range. This was permissible rebuttal argument. (See *People v. McDermott* (2002) 28 Cal.4th 946, 1003 [no misconduct where prosecutor described defendant as "a mutation of a human being," a "wolf in sheep's clothing," a "traitor," a person who "stalked people like animals," and someone who had "resigned from the human race" and compared her to a germ, a mad dog, and a snake].)

*Torture.* Finally, defendants claim it was improper for the prosecutor to mention "torture" when arguing it was possible to have both an intent to kill and an intent to do something less. Rojas's lawyer objected that this misstated the law and that torture was not part of the case. The court responded, "That is correct, torture is not charged in this case, ladies and gentlemen." Counsel properly objected. The court immediately cured any misimpression the prosecutor may have left.

## G

Dunger and Rojas lastly argue the trial court erroneously imposed a three-year great bodily injury sentencing enhancement for count 2. The prosecution concedes the error.

Before submitting the case to the jury, the trial court concluded the great bodily injury enhancement could not apply to the aggravated mayhem count because the elements of the crime included such injury. So the court omitted the enhancement for this count, and the jury never made a related finding.

28

Nevertheless, at the sentencing hearings, the court recognized and stayed this sentencing enhancement on count 2.

Because the jury neither considered nor found true this enhancement for this count, the court must strike the enhancement.

## DISPOSITION

The judgment is affirmed. We direct the sentencing court to modify the judgment and abstract by striking the section 12022.7 sentencing enhancement for count 2. This modification need not require a hearing or the presence of the defendants. We direct the court to forward a certified copy of the corrected abstract of judgment to the Department of Corrections and Rehabilitation.


WILEY, J.


We concur:



GRIMES, Acting P. J.



STRATTON, J.

29